MERISANT COMPANY, Plaintiff,

v.

McNEIL NUTRITIONALS, LLC, and McNeil–PPC, Inc., Defendants.

Civil Action No. 04–5504.

United States District Court, E.D. Pennsylvania.

March 2, 2007.

Abraham C. Reich, Gregory B. Williams, Beth Lillian Domenick, Fox Rothschild O'Brien & Frankel LLP, Philadelphia, PA, Gregg F. Locascio, Jeffrey G. Landis, Jonathan Daniel Brightbill, Karen M. Robinson, Kirkland & Ellis LLP, Washington, DC, Thomas M. Monagan, III, Kirkland & Ellis, Chicago, IL, for Plaintiff.

Alfred W. Putnam, Jr., David J. Kessler, Drinker Biddle & Reath LLP, Philadelphia, PA, Brian N. Lasky, Clay J. Pierce, Jeffrey D. Rotenberg, Jennifer L. Higgins, Steven A. Zalesin, Patterson Belknap Webb & Tyler LLP, New York, NY, for Defendants.

## Memorandum and Order

GENE E.K. PRATTER, District Judge.

Merisant Company, Inc. ("Merisant") alleges that McNeil Nutritionals, LLC and McNeil–PPC, Inc. engaged in false and misleading advertising in violation of Section 43(a) of the Lanham Act, 15 U.S.C. § 1125, and in violation of the Pennsylvania common law of unfair competition. The parties have engaged in extensive discovery activities, leading to their submission of various summary judgment motions as well as dueling *Daubert* motions. Specifically, the McNeil parties have filed a motion for summary judgment, and Merisant moves for partial summary judgment seeking to preclude McNeil from presenting an affirmative defense of "unclean hands." In addition, Merisant and McNeil have each filed a motion alleging that testimony from one or more of the opposing party's expert witnesses is inadmissible under Rule 702 of the Federal Rules of Evidence and pursuant to *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny. McNeil filed a motion to exclude the testimony of Dr. James Fisher, and Merisant filed a motion to exclude the testimony of Dr. Steven Munger.[1] For the reasons detailed below, the Merisant motion concerning the unclean hands defense will be granted; the remainder of these specific motions will be denied.

### FACTUAL AND PROCEDURAL BACKGROUND

The following factual background appears in the parties' respective, very thorough Statements of Facts presented in their Motions.

Merisant is a privately held company that manufactures premium brands of artificial sweeteners, including Equal,[2] NutraSweet and Canderel. Merisant's Statement of Facts ¶¶ 1, 5. The sweetening

---

1. Merisant has also filed a Motion to Exclude the Survey Conducted by Susan S. McDonald and all related testimony and opinion (Docket No. 110), and a Motion to Exclude the Survey Conducted by Robert L. Klein and all related testimony and opinion (Docket No. 112). Because the Court expects that the parties will submit additional motions in *limine* seeking to exclude survey evidence and related testimony, the Court will rule on these two motions at a later date.

2. Equal brand sweetener was launched in the United States in 1982 by G.D. Searle & Company, Inc ("Searle"). Merisant's Statement of Facts ¶ 2. In 1985, Monsanto Company ("Monsanto") acquired Searle. *Id.* ¶ 4. In March 2000, Merisant acquired the assets of Monsanto's tabletop sweetener business, including the brands Equal (in the United States) and Canderel (internationally). *Id.* ¶ 5. At the same time, Monsanto sold its NutraSweet business to a new company named NutraSweet Company, Inc. *Id.* In the United States, Merisant US, Inc., a subsidiary of Merisant, sells both Equal and NutraSweet. *Id.* ¶ 6.

ingredient in Equal is aspartame. *Id.* ¶¶ 2, 13; McNeil's Statement of Facts ¶ 3. The other ingredients in Equal are dextrose and maltodextrin. Merisant's Statement of Facts ¶ 13.

McNeil Nutritionals, LLC is a Delaware limited liability company with its principal place of business in Fort Washington, Pennsylvania. Compl. ¶ 7. McNeil–PPC, Inc. is a New Jersey corporation with a principal place of business in Skillman, New Jersey. Compl. ¶ 8. McNeil Nutritionals, LLC and McNeil–PPC, Inc. (collectively, "McNeil") market and distribute an artificial sweetener under the brand name Splenda. McNeil's Statement of Facts ¶ 4. The sweetening ingredient in Splenda is sucralose. *Id.* Sucralose is an artificial sweetening ingredient that is made through a process that begins with sucrose, i.e., sugar, and then replaces three of eight hydroxyl groupings on the sucrose molecule with three chlorine atoms. *Id.* ¶ 5. The other ingredients in Splenda are maltodextrin and dextrose. Merisant's Statement of Facts ¶ 17. Unaltered sugar/sucrose is not an ingredient in Splenda. *Id.* Conversely, Splenda does not contain unaltered sugar/sucrose. *Id.*

The artificial sweetener industry has long considered concerns from consumers regarding the taste and health safety of artificial sweeteners. McNeil's Statement of Facts ¶¶ 12–14; Merisant's Statement of Facts ¶ 36. In response to these concerns, manufacturers of artificial sweeteners have attempted to avoid using certain language, such as the term "artificial," that may convey negative taste or health safety concerns. McNeil's Statement of Facts ¶ 15. Instead, companies in the industry, including Merisant and McNeil, employ the term "no-calorie sweetener" to describe their various artificial sweetener products. Some manufacturers seek to position their products as "like" sugar, for example, by using imagery and language evocative of sugar in their advertising and marketing materials. Merisant's Statement of Facts ¶¶ 36–38; McNeil's Statement of Facts ¶¶ 16–21. Artificial sweetener companies use the phrase "tastes like sugar" to advertise and market their artificial sweeteners. McNeil's Statement of Facts ¶ 21. Indeed, advertisements for artificial sweetener products often associate artificial sweeteners or their ingredients with items that occur in nature such as fruit, meat, grains or vegetables. *Id.* ¶¶ 22–30.

The Food and Drug Administration first approved sucralose for use as a food additive in 1998; and, in 1999, the approval was expanded to permit the use of sucralose as a general purpose sweetener. *Id.* ¶ 32. McNeil first introduced Splenda products for sale on a limited basis in April 1999, and, in September 2000, McNeil launched Splenda in retail stores throughout the United States. *Id.* ¶ 33.

McNeil has devoted substantial time, money and resources—approximately $235 million in advertising and promotional materials from 2000 to 2006—in an effort to create and develop a "unique brand identity" for Splenda. *Id.* ¶¶ 34–36. McNeil "has worked to establish a brand identity for Splenda that capitalized upon the unique sugar origins and sugar-like taste of the product." *Id.* ¶ 47. The exterior product packaging for all Splenda products sold in the United States since September 2000 have included a logo stating that Splenda is: "MADE FROM SUGAR, TASTES LIKE SUGAR." *Id.* ¶ 49. Similarly, all Splenda No Calorie Sweetener individual serving packets in the United States include the phrase that Splenda is "MADE FROM SUGAR SO IT TASTES LIKE SUGAR." *Id.* ¶ 50. Since September 2000, all television commercials and print advertisements for Splenda has included the tagline "made from sugar so it

tastes like sugar" or "Splenda tastes like sugar because it's made from sugar." *Id.* ¶¶ 51–52. Splenda is now the leading no-calorie sweetener, based on dollar sales, in the United States. *Id.* ¶ 44.

Merisant was aware of Splenda's "made from sugar, tastes like sugar" tagline on or around the September 2000 launch of Splenda. *Id.* ¶ 62. Merisant admits to being aware of Splenda's tagline in 2000. Merisant's Response ¶¶ 62–64. Merisant contends that as of that time, it had not conducted any research to determine whether Splenda's "made from sugar, tastes like sugar" tagline was misleading to consumers. *Id.* Instead, Merisant concluded that the "reasonable course was to raise the concerns with McNeil informally and attempt to resolve them outside the courtroom." Merisant's Statement of Facts ¶ 151.

In April 2002, Arnold Donald, Merisant's then-Chairman and Chief Executive Officer, sent a letter to Colin Watts, McNeil's then-President, expressing Merisant's concerns regarding Splenda's marketing campaign. McNeil's Statement of Facts ¶¶ 64; Merisant's Response ¶¶ 62–64. Mr. Donald wrote that in his view the Splenda tagline is "inherently false" because there was not a "causal relationship between the original sugar molecule and the resulting sugar-like taste of the sucralose molecule." McNeil's Statement of Facts ¶ 65. Mr. Donald wrote further that "stating that Splenda is made from sugar implied to consumers that Splenda is more natural and less artificial than competitive sugar substitutes." *Id.* ¶ 66. Merisant claims that, at the time of the letter, Mr. Donald did not have any data to support his personal beliefs about Splenda's claims. Merisant's Response ¶¶ 62–64.

In May 2002, Mr. Watts responded to Mr. Donald to express his disagreement with Merisant's suggestion that McNeil was promoting Splenda in a false or misleading manner. McNeil's Statement of Facts ¶ 70. In his letter to Mr. Donald, Mr. Watts wrote that the claim "SPLENDA no calorie sweetener is made from sugar so it tastes like sugar" does not "falsely imply that SPLENDA is more natural than competitive sugar substitutes.". 2d K. Clark Decl. Ex 105 at 1–2. In particular, Mr. Watts wrote:

> SPLENDA never has been promoted as "natural." It is identified as a "no calorie sweetener" in all advertising and promotional materials that mention its sugar origin. This generic discriptor clearly indicates to the consumer that the product is in the category of artificial sweeteners. Moreover, the claim is not comparative, so there is no reason to believe that consumers will perceive an implied claim that SPLENDA is more natural than other sugar substitutes.

*Id.* at 2. The parties exchanged further correspondence in late 2003 relating to Merisant's concerns over Splenda's marketing and brand positioning. McNeil's Statement of Facts ¶¶ 72–73.

Slightly more than four years after Splenda's launch in the United States, Merisant concluded in the fall of 2004 that there was a likelihood of consumer confusion regarding Splenda's advertising. Merisant's Statement of Facts ¶ 189. On October 22, 2004, Merisant sent a letter to the National Advertising Division of the Council of Better Business Bureaus (the "NAD") challenging McNeil's advertising for Splenda. McNeil's Statement of Facts ¶ 75; Merisant's Statement of Facts ¶¶ 189. McNeil did not respond directly to Merisant's NAD challenge. Rather, on November 18, 2004, McNeil filed a complaint against Merisant in the District Court for the District of Puerto Rico, seeking a declaratory judgment that McNeil's advertising and marketing for Splenda was

not false or misleading. McNeil's Statement of Facts ¶ 76.

One week later, Merisant filed its Complaint in this action. McNeil subsequently consented to the dismissal of its complaint in the Puerto Rico action. *Id.* ¶ 77.

Merisant's Complaint includes five counts, four of which allege violations of Section 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125. Under the Lanham Act, Merisant argues that (1) McNeil's claim that Splenda is "Made From Sugar" is both literally and impliedly false, and is misleading, Compl. ¶¶ 47–50, (2) the claim that Splenda is "Made from Sugar So It Tastes Like Sugar" is literally false and misleading, *id.* ¶¶ 51–54, (3) McNeil's implied claim that Splenda is natural is false and misleading, *id.* ¶¶ 55–58, and (4) the implied claim that Splenda contains sugar is false and misleading, *id.* ¶¶ 59–62. Lastly, (5) Merisant argues that McNeil's advertising campaign and packaging, including the use of the Splenda logo and tagline, are misleading to consumers, and have caused actual consumer confusion and damage to Merisant in violation of the Pennsylvania common law of unfair competition. *Id.* ¶¶ 63–66. In terms of remedies, Merisant seeks:

- A permanent injunction against McNeil to forbid its use of a logo, tagline or statement on its Splenda product that is false and misleading, including but not limited to enjoining the use of the logo and tagline currently used by McNeil;

- An order directing McNeil to institute a corrective advertising campaign of comparable size and scope to its existing advertising campaign, clarifying that Splenda is not sugar or natural, but is an artificial sweetener utilizing a synthetic chemical whose taste does not come from sugar;

- An award of compensatory damages, including but not limited to damages for diverted sales and loss of goodwill and reputation;

- An award of treble and other available exemplary damages, pursuant to 15 U.S.C. § 1117;

- An award of all costs and expenses incurred by Merisant in connection with this action, including reasonable attorneys' fees and disbursements; and

- Any further relief that the Court deems just and proper.

*Id.* at 18–19.

As indicated above, McNeil has filed a Motion for Summary Judgment (Docket No. 107) in which it argues that (1) the equitable doctrine of laches should serve to bar Merisant's claims in their entirety, (2) McNeil is entitled to summary judgment on Merisant's "implied falsity" claim, and (3) Merisant is not entitled to damages in the form of disgorgement of McNeil's profits. Merisant has filed a Motion for Partial Summary Judgment (Docket No. 108) seeking to preclude McNeil from presenting an affirmative defense of "unclean hands."

In addition, Merisant and McNeil have each filed a motion alleging that testimony from one or more of the opposing party's expert witnesses is inadmissible under Rule 702 of the Federal Rules of Evidence and pursuant to *Daubert* and its progeny. McNeil filed a motion to exclude the testimony of Dr. James Fisher (Docket No. 106), and Merisant filed a motion to exclude the testimony of Dr. Steven Munger (Docket No. 109).

The Court presided over oral arguments on all of these motions on January 30, 2007. The Court will address each of these motions in turn.

## I. Motions for Summary Judgment

### A. Standard for Summary Judgment

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue is "genuine" if the evidence is such that a reasonable jury could return a verdict for the non-moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

The party seeking summary judgment always bears the initial responsibility for informing the court of the basis for the motion and for identifying those portions of the record that it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Where the non-moving party bears the burden of proof on a particular issue at trial, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the non-moving party's case." *Id.* at 325, 106 S.Ct. 2548. After the moving party has met its initial burden, "the adverse party's response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322, 106 S.Ct. 2548. Under Rule 56, the Court must view the evidence presented in the motion in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505.

### B. Claims Pursuant to Section 43(a) of the Lanham Act

■ Section 43(a) of the Lanham Act prohibits, *inter alia*, any false or misleading representation of fact that:

in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or another person's goods, services or commercial activities ...

15 U.S.C. § 1125(a)(1)(B). To establish a Lanham Act claim, a plaintiff must show: (1) the defendant made false or misleading statements about its product; (2) there is actual deception or a tendency to deceive a substantial portion of the intended audience; (3) the deception is material in that it is likely to influence purchasing decisions; (4) the advertised goods traveled in interstate commerce; and (5) there is a likelihood of injury to the plaintiff, e.g., declining sales and loss of good will. *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 171 (3d Cir.2001). As our Court of Appeals has noted, a plaintiff may prove a Lanham Act violation in one of two ways: "[e]ither the advertisement must be literally false, or it must be literally true but misleading to the consumer." *Id.* (citing *Castrol Inc. v. Pennzoil Co.*, 987 F.2d 939, 943 (3d Cir.1993)); *see also Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002) ("Liability arises if the commercial message or statement is either (1) literally false or (2) literally true or ambiguous, but has the tendency to deceive consumers."). The court stated:

If an advertisement is literally false, the plaintiff does not have to prove actual consumer deception. If, on the other

hand, an advertisement is literally true but misleading, the plaintiff must prove actual deception by a preponderance of the evidence. If a claim is literally true, a plaintiff "cannot obtain relief by arguing how consumers could react; it must show how consumers actually do react." *Highmark*, 276 F.3d at 171 (citations omitted); *see also Castrol*, 987 F.2d at 943 (noting that a plaintiff must prove either literal falsity or consumer confusion, but not both). As noted above, Merisant alleges that McNeil has made both literally and impliedly false claims in its advertising and marketing campaign for Splenda.

### C. McNeil's Motion for Summary Judgment

McNeil's Motion for Summary Judgment contains three arguments. First, McNeil argues that all of Merisant's claims are barred by the equitable doctrine of laches. Next, McNeil argues that it is entitled to summary judgment on Merisant's "implied falsity" claims. Finally, McNeil argues that Merisant is not entitled to disgorgement of McNeil's profits, i.e., an "accounting of profits."

Merisant presents arguments addressing the merits of all three of McNeil's claims. However, as a general matter, Merisant also argues that McNeil's motion ignores "hotly disputed" facts in the record presented to the Court. Because of these disputes of material fact, Merisant argues that summary judgment is inappropriate with respect to all of McNeil's arguments.

#### 1. *Whether Merisant's Claims are Barred by Laches*

McNeil argues that Merisant's claims are barred in their entirety by the equitable doctrine of laches. Specifically, McNeil asserts that Merisant's investors and executives were aware of McNeil's "made from sugar" product positioning prior to the launch of Splenda in September 2000, yet Merisant waited until November 2004 before challenging McNeil in court. McNeil argues that Merisant's four-year delay, after becoming aware of Splenda's product positioning in 2000 and then waiting to file suit in federal court in 2004 challenging that same positioning, should bar Merisant's claims in their entirety on the grounds of laches.

Laches is an equitable doctrine addressed to the sound discretion of the district judge. *Univ. of Pittsburgh v. Champion Prods., Inc.*, 686 F.2d 1040, 1045 (3d Cir.1982) (*citing Gruca v. United States Steel Corp.*, 495 F.2d at 1258). Laches consists of two elements: (1) inexcusable delay in bringing suit, and (2) prejudice to the defendant as a result of the delay. *Santana Prods. v. Bobrick Washroom Equip., Inc.*, 401 F.3d 123, 138 (3d Cir.2005). In this Circuit, laches will serve to bar both monetary and injunctive relief. *Joint Stock Soc'y v. UDV N. Am., Inc.*, 53 F.Supp.2d 692, 712 (D.Del.1999), *aff'd*, 266 F.3d 164, 185 n. 12 (3d Cir.2001) (affirming holding that plaintiffs lacked standing to sue; appellate court did not reach the district court's ruling on laches). Laches "usually requires the kind of record only created by full trial on the merits" because "the correct disposition of the equitable defense of laches can only be made 'by a close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public.'" *Country Floors, Inc. v. Gepner*, 930 F.2d 1056, 1066 (3d Cir.1991) (*quoting* 2 J. McCarthy Trademarks and Unfair Competition 573 (2d ed.1984)).

"Laches may be properly applied so long as its application is equitable in light of the public's interest in being free from confusion and deception." *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 193 (2d Cir.1996); *see also Country Floors*,

930 F.2d at 1066; *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 461–462 (4th Cir.1996) (setting aside the district court's finding that laches barred the plaintiff's suit in part because the district court failed to consider the public interest in avoiding confusion between two similar trademarks).

### a. Inexcusable Delay

The first step in analyzing a laches claim is to determine which statute of limitations governs the plaintiff's claims. Whether the statute of limitations has run determines which party bears the burden of proof. *See Gruca v. United States Steel Corp.*, 495 F.2d 1252, 1259 (3d Cir.1974) ("The length of delay, while not mandating the outcome, does control burdens of proof."). Once the statute of limitations for a cause of action expires, the defendant "enjoys the benefit of a presumption of inexcusable delay and prejudice." *Santana Prods.*, 401 F.3d at 138. Under this presumption, the plaintiff has the burden of proving both that delay was excusable and that it did not prejudice the defendant. *Id.* at 139. If the statute of limitations has not run, there is no presumption, and the defendant has the burden of proving both inexcusable delay and prejudice as a result of the delay.

Merisant seeks to invoke Section 43(a) of the Lanham Act. The Lanham Act does not contain a statute of limitations. "Instead, the Act subjects all claims to 'the principles of equity.'" *Santana Prods.*, 401 F.3d at 135 (*quoting* 15 U.S.C. § 1117(a)). A district court must look to the most closely analogous statute of limitations under the law of state where the district court sits. Under Pennsylvania law, the six-year "catch all" statute of limitations under the Pennsylvania Unfair Trade Practices and Consumer Protection Law ("UTPCPL"), 73 Pa. Stat. Ann. § 201–1 *et seq.*, applies to claims under Section 43(a) of the Lanham Act. *See Santana Prods.*, 401 F.3d at 137 ("The UTPCPL is the most analogous state cause of action that would encompass all claims brought under § 43(a) of the Lanham Act."). Therefore, and the parties essentially agree, the UTPCPL's six-year statute of limitations applies to Merisant's Section 43(a) claims.

McNeil argues that Merisant waited four years before bringing its claims and concedes that this four-year period does not exceed the UTPCPL's six-year "catch-all" limitations period. Therefore, McNeil will not benefit from a presumption of inexcusable delay and prejudice, but bears the burden of establishing both elements.

As noted above, McNeil launched the Splenda product in 2000. McNeil contends that several months before the launch, Merisant's institutional investors were aware that McNeil would likely promote Splenda using the phrase "tastes like sugar because it's made from sugar," and that they acknowledged that this tagline might be damaging to Equal. Def. Mem. Supp. 28. McNeil asserts that following Splenda's entry into the market, Merisant's market share and profits fell steadily from 2000 to 2003, yet Merisant "did nothing whatsoever to try and stop McNeil's supposed misconduct for more than four years after the product's nationwide launch." Def. Mem. Supp. 28–29.

Merisant denies that it "delayed" in bringing suit. Its main contentions in this regard appear to be as follows. First, when Splenda was first launched in 2000, Merisant recognized an inherent problem in McNeil's advertising, but at that time saw no evidence illustrating "likely deception of a *substantial* portion of consumers." Pl. Mem. Opp'n 14. Next, Merisant contends that McNeil's advertising for Splenda changed, i.e., "evolved," and con-

sidered that a lawsuit would not have been appropriate while the advertising for Splenda was in flux. Merisant also argues that it faced a "David and Goliath" problem, but, it seems, without sufficient faith in its aim or, at least, in its financial wherewithal, in that a decision to sue McNeil would have essentially been a decision to also sue McNeil's parent company, Johnson & Johnson, one of the largest and most well-capitalized companies in the world. Therefore, Merisant opted to contact McNeil informally. Merisant Statement of Facts ¶ 151.

As described above, Merisant's CEO sent a letter to Mr. Watts at McNeil in April 2002, *asking* McNeil to determine the appropriateness of continuing to use advertising claims that imply that Splenda is more natural or less artificial than other sugar substitutes. Merisant Statement of Facts ¶ 153. At this point, Merisant argues that because it lacked "any actionable evidence of consumer confusion," filing a Lanham Act lawsuit would have been premature. Pl. Mem. Opp'n 15.

At that time, other than to write the above-mentioned letter, Merisant "concluded that the reasonable course was to continue to observe the market and McNeil's actions." *Id.* Merisant did not seek to conduct its own survey of consumers' potential confusion over Splenda's packaging or advertising. Instead, Merisant waited to see if McNeil would "take proactive steps to ensure that its Splenda advertising was not confusing." Pl. Mem. Opp'n 15–16.

Merisant also cites McNeil's "evolving advertising campaign." Pl. Mem. Opp'n 17. McNeil utilized a "Moon" advertising campaign that ran from January to February/March 2001 and from December 2001 to December 2002. Merisant apparently did not object to the "Moon" campaign, which it characterizes as a "classic" low

calorie sweetener advertisement. *Id.* In addition, McNeil's "Moon" commercials contained the phrase "but its not sugar." *Id.* Merisant argues that McNeil's "Moon" campaign was not successful—possibly because consumers still (accurately) viewed Splenda as an "artificial sweetener"—so, as characterized by Merisant, McNeil switched gears in order to align Splenda more closely with sugar. In this regard, Merisant notes that McNeil launched new advertising in 2003 that included the phrase "made from sugar, tastes like sugar," but excluded the phrase "but its not sugar," which had been included the previous "Moon" ads. Further, McNeil's 2003 advertisements included the phrase "Think Sugar, Say Splenda." Pl. Mem. Opp'n 18. In response, McNeil notes that even though it may have changed its advertising campaign, the phrases "made from sugar, tastes like sugar" or "made from sugar so it tastes like sugar" have appeared on Splenda packaging since its inception in 2000.

After these new commercials appeared, even though it was "concerned," Merisant continued its forebearance and attempted to address the situation through a public relations campaign clarifying that Splenda is not natural. Not surprisingly, McNeil was not pleased and contacted Merisant to deny that consumers were confused and to maintain that McNeil did not market Splenda as a natural sweetener. Pl. Mem. Opp'n 20. This denial allegedly led to Merisant's decision to challenge McNeil's advertising in the NAD in October 2004, which, in turn, led to the filing of this Complaint the following month.

### b. Prejudice

McNeil claims that Merisant's "delayed" suit would cause severe prejudice because McNeil has invested hundreds of millions of dollars in the development and expansion of the Splenda brand market position-

ing. McNeil claims to have spent nearly $235 million through 2006 to promote Splenda, including its tagline "made from sugar, tastes like sugar," which has become an integral part of Splenda's brand identity. McNeil's Statement of Facts ¶ 36. However, McNeil incurred only $125 million of this expenditure prior to the end of 2004, which means that McNeil spent another $110 million on its Splenda advertising campaign after Merisant commenced this suit. *Id.* ¶¶ 35–36.

McNeil relies primarily on two cases from outside this Circuit to support its laches argument. In *Conopco, Inc. v. Campbell Soup Co.*, 95 F.3d 187, 190 (2d Cir.1996), Campbell launched an advertising campaign in 1988 touting the thickness of its Prego's pasta sauces. *Id.* at 190. Campbell's commercials showed a direct comparison between Prego and Conopco's Ragu sauces, and portrayed Prego as thicker than Ragu. Conopco knew about the advertising within weeks of its first airing but waited five years—until 1993— before filing suit. *Id.* However, Conopco lodged a complaint with three major television networks in March 1989 and also filed a complaint with the NAD in 1991 before bringing suit. *Id.* Even though Campbell made some modifications to its advertising following Conopco's complaints,[3] Conopco still believed Campbell's advertisements were misleading and filed its lawsuit in June 1993. *Id.*

Campbell moved for summary judgment on the basis of laches, but the district court denied Campbell's motion, finding that issues of material fact remained in dispute. *Id.* Trial commenced to determine the appropriateness of injunctive relief, and at the close of Conopco's case,

Campbell moved for judgment on partial findings pursuant to Rule 52(c) of the Federal Rules of Civil Procedure, again on laches grounds. *Id.* The district court granted Campbell's motion and dismissed Conopco's case. *Id.* The Second Circuit Court of Appeals affirmed. *Id.* at 195.

With respect to the prejudice, the Second Circuit noted that Campbell had "committed massive resources to best exploit a marketing strategy which it chose a half dozen years ago." *Id.* at 192. Campbell sought a market position as the "thick" sauce by using "comparative advertisements." The court noted that when Campbell launched its "thickness" campaign, other product positions were available to it, including marketing its products as the "healthy" or "economical" sauces. By waiting five years before bringing suit, Conopco had precluded the possibility that Campbell could adopt an alternative marketing strategy. *Id.* The court concluded that this prejudice warranted invoking laches to dismiss Conopco's claims.

McNeil also relies on *Hot Wax, Inc. v. Turtle Wax, Inc.*, 191 F.3d 813 (7th Cir. 1999), in which the parties were competitors in the automated carwash/car wax industry. Hot Wax suspected in the late-1970s that Turtle Wax had misrepresented the character and quality of its products, yet it waited until 1997—over 20 years— before filing suit. *Id.* at 822. Hot Wax asserted that its delay should be excused because Turtle Wax's "evolutionary advertising scheme" became misleading over the course of time and because Hot Wax needed time to conduct a chemical analysis of Turtle Wax's products to prove that Turtle Wax was not actually a "wax." *Id.* at 823. In light of the record before it, including

---

**3.** The television networks did not take any steps to bar the modified commercials from being televised. *Conopco*, 95 F.3d at 190. Following Conopco's 1991 challenge in the NAD, the NAD ruled in Conopco's favor and Campbell further modified its commercials. *Id.*

Hot Wax's admissions during discovery, the court affirmed summary judgment in favor of Turtle Wax. The court dismissed Hot Wax's "excusable delay" arguments as *post hoc*, litigation-strategy rationalizations, stating that it would be inequitable for a company to idly sit by and see how successful its competitor would be before filing a lawsuit. *Id.* Like *Conopco*, where the plaintiff also attempted to justify its delay by noting that it had lodged complaints with the media instead of immediately filing suit, the court in *Hot Wax* rejected a similar argument from Hot Wax that its delay was excusable due to its attempts to resolve its claims without litigation. *Id.* Noting that Hot Wax sent a total of five letters to various recipients, including Hot Wax, concerning the marketing of Turtle Wax's products, the court rejected this "sparse letter writing campaign," finding that it was not a serious attempt at resolving its concerns. *Id.* at 824.

As to prejudice, the *Hot Wax* court noted that Hot Wax had permitted Turtle Wax's advertising to go "unchecked" between one and two decades, while Turtle Wax invested a significant amount of time and money to develop and promote its products. *Id.* Also as in *Conopco*, the *Hot Wax* court noted that had Hot Wax brought its claims sooner, Turtle Wax could have "invested its time and money in other areas or simply renamed its product." *Id.* Citing the "extreme length of the unreasonable delay," the appellate court affirmed the dismissal on laches grounds. *Id.*

c. The Public Interest and "Unclean Hands" as a Defense to Laches

Merisant claims that because McNeil "intentionally and egregiously deceived consumers," triable issues of fact exist as to whether McNeil can assert the equitable defense of laches. Merisant claims one

who acts inequitably cannot rely on an equitable defense. *See Monsanto Co. v. Rohm & Haas Co.*, 456 F.2d 592 (3d Cir. 1972) ("The guiding doctrine in this case is the equitable maxim that 'he who comes into equity must come with clean hands.' This maxim is far more than a mere banality. It is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief, however improper may have been the behavior of the defendant."); *W. Indian Sea Island Cotton Ass'n v. Threadtex, Inc.*, 761 F.Supp. 1041, 1051 (S.D.N.Y. 1991) ("In order to prevail on a laches defense, a defendant must establish his own good faith. Thus, a defendant claiming laches 'must be able to demonstrate the absence of any intent to confuse and deceive the public . . . .") (citations omitted). Courts have refused to accept a defendant's laches defense when an issue of fact remained as to the defendant's good faith. *See W. Indian Sea Island Cotton Ass'n*, 761 F.Supp. at 1051 (dismissing defendant's motion for summary judgment on laches grounds where the plaintiffs raised factual questions as to defendants' good faith); *but see Hot Wax*, 191 F.3d at 826 (rejecting plaintiff's assertion that defendant's laches defense was barred by its own "unclean hands" and declining "effectively to preclude the application of laches whenever a dispute of fact regarding the merits of a Lanham Act claim existed because . . . conceivably all suits involving Lanham Act claims could involve accusations of fraudulent or deceptive conduct.").

The *Conopco* and *Hot Wax* courts considered the plaintiff's "public interest" claims and rejected them in both cases. In *Conopco*, the court noted that the "public's interest is especially significant when health and safety concerns are implicated, as with the advertising of over the counter

medications." *Conopco*, 95 F.3d at 194. However, the court noted that "while public health and safety concerns may well overwhelm other considerations in the application of laches," in a misleading advertising case involving the thickness of pasta sauce, such an outcome was not dictated. *Id.*

The *Hot Wax* opinion addressed both concerns of "public interest" and the plaintiff's assertion that the defendant's "unclean hands" should bar use of the laches defense. The court noted that the defendant had offered evidence that purchasers of these products are satisfied by the performance of Turtle Wax. In response, the plaintiff could not provide any evidence to contradict this claim. *Hot Wax*, 191 F.3d at 827. The court stated that, "[g]iven the fact that there has been no clear showing that the marketing of Turtle Wax's products has had or is having a negative impact on the public interest, we conclude that the public interest does not stand in the way of the application of the doctrine of laches in the present case." *Id.*

*Conopco* and *Hot Wax*, while not precedential in this Circuit, provide some guidance in this case. These two cases certainly cut against Merisant's positions in certain respects and are distinguishable in others. The length of the delay at issue here (four years) is closer to *Conopco* (five years) than to *Hot Wax* (20 years). As the court in *Hot Wax* noted, as the years add up, the delay can become more and more "inexcusable." Even though four years is within the most closely analogous statute of limitations in this case, four years is not an inconsequential period of time in the commercial arena, especially for a large company (or a smaller company with a sizeable corporate parent) who endeavors to launch a new product on a nationwide scale, complete with a novel brand positioning, new packaging and print and television advertising, etc. A four-year delay can be severely prejudicial when a company builds its entire product image and market positioning on a very specific advertising campaign, as McNeil has done with its Splenda campaign. As McNeil attests, it spent hundreds of millions of dollars over a period of a few years to develop and launch Splenda as a new entrant in an already highly competitive market. McNeil notes that some form of the "made from sugar" tagline appears on every package or individual packet sold, and that it has invested over $230 million on promoting its "made from sugar" image. In other words, this case does not involve merely canceling a single television commercial if it is found to be misleading. McNeil argues that a successful outcome for Merisant would essentially derail Splenda's entire, "ubiquitous" identity.

Further, Merisant's assertions that it was waiting to see how McNeil's advertising would "evolve" and that it attempted to resolve its dispute with McNeil informally through correspondence or administrative complaints, were similarly rejected in either *Conopco* or *Hot Wax* as insufficient excuses for a delay in bringing suit.

However, *Conopco* is also distinguishable from this case in a different fashion because in *Conopco*, Campbell's advertising directly targeted Conopco's competing product. Therefore, one could argue that the impetus was on Conopco to defend itself against a direct attack and that Conopco did sit on its rights too long by waiting five years to sue. However, McNeil's ads at issue here do not directly target Merisant or any other competitor. Instead, McNeil's ads tend to distance McNeil from the other artificial sweetener manufacturers completely. The criticism against McNeil is that it chose to position Splenda as competing with sugar, and not

as competing directly against other artificial sweeteners. There is nothing *per se* misleading about this approach. Indeed, all table-top artificial sweeteners effectively compete, in some respects, against both sugar and the other artificial sweeteners on the market. This approach can become misleading, however, when a company creates the false perception among consumers that an artificial product is, in fact, sugar. That is what Merisant argues here. Furthermore, while McNeil contends that Merisant cannot idly sit by and wait to see whether Splenda would be successful before deciding whether to sue, there is a legitimate difference between waiting to see whether an advertising campaign would be successful and waiting to see whether the same campaign would be misleading to consumers.

In addition, in contrast to *Conopco*, where the court dismissed the plaintiff's invocation of concerns to the public interest because "health and safety concerns" were not implicated in that case, such concerns are potentially implicated here. *Conopco*, 95 F.3d at 194. While Merisant does not argue that Splenda is unhealthy or unsafe, as a general matter, it is important that consumers, including individuals with diabetes or other dietary restrictions, know whether the food products they purchase contain sugar, are "natural," or are artificial.

The facts surrounding Merisant's alleged "delay" remain in dispute. The subjectivity that necessarily is an ingredient in the recipe of delay may be reason alone to leave this issue for a jury's evaluation of the pertinent witnesses. The Court will not rule, that this juncture, that Merisant's delay was "inexcusable" as a matter of law. As a matter of principle, however, the Court does not see that a company is bound to rush to court immediately upon becoming aware of a competitor's poten-

tially misleading advertising claim, on the assumption that such advertising may cause injury to it or the public interest. There is some credence to Merisant's argument that before a product is launched, and even in the early stages of developing, advertising and marketing a product, it would be difficult (if not impossible) to determine whether a certain aspect of a product's advertising would engender actual confusion among consumers. Further, it may well not be prudent to sue a competitor over an advertising campaign that is still in flux, or a campaign that has not had even marginal success such that it could not have caused any actionable injury.

There are certainly competing concerns here. For one, if McNeil's advertising for Splenda is truly misleading, and if Merisant offers evidence that McNeil intended to mislead consumers, then its seems that principles of equity should prevent McNeil from successfully asserting a laches defense. If, on the other hand, the facts reveal that McNeil simply succeeded in creating a revolutionary, highly lucrative marketing strategy, and Merisant only chose to sue McNeil once Merisant saw that McNeil's strategy was clearly successful, then a laches defense is appropriate.

Ultimately, whether to apply the doctrine of laches is a matter of the Court's discretion. In *Conopco* and *Hot Wax*, both courts noted that the plaintiff had not carried its burden of showing that the defendant had acted to deceive the public. In this case, however, Merisant has offered evidence that could permit a trier of fact to conclude that McNeil intended to manipulate impermissibly the public's opinion as to Splenda's characteristics. Our Court of Appeals approvingly cited the Supreme Court's acknowledgment, in a patent infringement case, that the " 'guiding doctrine' " in matters of equity is the maxim

that "'he who comes into equity must come with clean hands.'" *Monsanto,* 456 F.2d at 598–99 (*quoting Precision Co. v. Automotive Co.,* 324 U.S. 806, 814–16, 65 S.Ct. 993, 997, 89 L.Ed. 1381 (1945)). The Supreme Court noted that this maxim "is a self-imposed ordinance that closes the doors of a court of equity to one tainted with inequitableness or bad faith relative to the matter in which he seeks relief," and requires that the party seeking equitable relief "shall have acted fairly and without fraud or deceit as to the controversy in issue." *Precision,* 324 U.S. at 814–15, 65 S.Ct. 993. Further, the Supreme Court stated that "[t]his maxim necessarily gives wide range to the equity court's use of discretion in refusing to aid the unclean litigant." *Id.* at 815, 65 S.Ct. 993.

■ In light of this judicial guidance, the Court finds that Merisant has offered sufficient evidence that raises genuine disputes of material facts as to whether McNeil's hands are "unclean." For example, in stark contrast to the story McNeil tells, in which Merisant is described as idly sitting by while McNeil builds Splenda's product identity and erodes Merisant's market share, Merisant describes a veritable "Sugargate" scenario. As Merisant's story follows, McNeil set out to intentionally deceive consumers into believing that Splenda is a natural product, McNeil lied to Merisant and other companies about its intentions in marketing Splenda, and initiated a "cover up" to eliminate any evidence that it intended to convey the misimpression that Splenda is "not an artificial product."

Merisant provides evidence that McNeil sought to "align" Splenda with sugar, and sought to communicate the message that Splenda was "natural" and to promote the misconception that Splenda "is not artificial." Merisant's Statement of Facts ¶¶ 152, 154; 2d Clark Decl. Ex. 103. An advertising presentation prepared by an outside advertising consultant for McNeil Specialty Products Company, included among a list of "carefully considered decisions," the decision to "positions [sic] Splenda as 'not artificial.'" 2d Clark Decl. Ex. 23 at EMCN–MER 810530. This presentation offered:

Splenda: Think of it as sugar without the calories.

— Strong *"natural,"* "healthy" playback

— Significant distance from "artificial sweeteners"

*Id.* at EMCN–MER 810534. According to Merisant, McNeil knew that it could not directly state to consumers that Splenda is natural, because Splenda is not a natural product, but that McNeil needed to allow consumers to "infer" the "naturalness" of Splenda. 2d Clark Decl. Exs. 26, 34. Merisant cites to internal McNeil documents or third-party documents provided to McNeil that indicate that, at the very least, McNeil was aware that the perception existed among consumers that Splenda was "natural" or was "not an artificial sweetener." 2d Clark Decl. Ex. 111 at EMCN–MER 29008 ("Sugar sourcing for Splenda implied for many that it is: More natural."); *id.* (listing under the "Identifying Some Less Positive Perceptions," the statement, "[a]t the same time, 'made from sugar' caused some to be unclear as to whether: Splenda is *truly natural.*"). Merisant argues that despite McNeil's attempt to imply that Splenda was natural, in response to the April 22, 2002 letter from Merisant's Mr. Donald, McNeil's president Mr. Watts stated that "SPLENDA never has been promoted as 'natural.'" 2d Clark Decl. Ex. 105 at EMCN–MER 255963. Further, Merisant asserts that not only had McNeil intended to promote Splenda as natural, but that there is evidence that McNeil had been successful in

doing exactly that. Shortly after Mr. Watts responded to Mr. Donald, a Splenda "Business Update" noted that the attribute "not an artificial sweetener" was among the "largest gains post-media" for Splenda. 2d Clark Decl. Ex. 106 at EMCN–MER 23157.

With respect to an alleged "cover up," Merisant notes that McNeil had regularly polled consumers as to whether "not an artificial product" was an attribute that consumers associated with Splenda. At some point in the fall of 2002, however, McNeil "drop[ped] the attribute 'Is not an artificial product'" from its tracking study "for legal reasons." 2d Clark Decl. Ex. 107; see also 2d Clark Decl. Ex. 54 at 95:14–96:16; 2d Clark Decl. Exs. 108–109 (removing a similar attribute from another tracking survey).

McNeil vigorously disputes all of Merisant's characterizations as to its allegedly deceptive intentions and misrepresentations. Whether McNeil intended to deceive consumers, prevaricate to Merisant and others about its intentions and its data on consumer perceptions of Splenda, and whether McNeil removed a specific attribute from its tracking surveys for legitimate legal or business reasons or "to avoid generating incriminating information," as Merisant contends, are all factual matters that are disputed by the parties. These matters directly pertain to whether McNeil's hands are "unclean," and, thus, whether McNeil is entitled to equitable relief.

Too many facts are in dispute at this stage when the Court must view the evidence presented in the light most favorable to the non-moving party. *Anderson*, 477 U.S. at 255, 106 S.Ct. 2505. It will be difficult for a movant to prevail on laches grounds at the summary judgment phase, without a complete factual record compiled after a trial on the merits, and after a " 'a

close scrutiny of the particular facts and a balancing of the respective interests and equities of the parties, as well as of the general public.'" *Country Floors*, 930 F.2d at 1066 (*quoting* 2 J. McCarthy Trademarks and Unfair Competition 573 (2d ed.1984)). Because the factual record before the Court contains numerous hotly contested disputes of material fact, summary judgment on the laches issue is inappropriate. Therefore, McNeil's motion for summary judgment on laches grounds will be denied.

### 2. *Merisant's "Implied Falsity" Claims*

■ Merisant argues that Splenda's claim "made from sugar, tastes like sugar" is impliedly false, and violates Section 43(a) of the Lanham Act. Merisant asserts that this phrase implies to consumers that Splenda contains sugar or is a natural product. As noted above, "liability under the Lanham Act arises if the commercial message is literally true or ambiguous, but has the tendency to deceive consumers." *Novartis Consumer Health, Inc. v. Johnson & Johnson–Merck Consumer Pharms. Co.*, 290 F.3d 578, 586 (3d Cir.2002).

McNeil claims that the statements that Splenda is "made from sugar" and "tastes like sugar" are in fact literally true, and that they cannot reasonably be perceived to mean that Splenda "contains" sugar or is a "natural" product. Further, McNeil claims that Merisant's only evidence in support of the implied falsity claim is composed of two surveys that address consumer perceptions of Splenda's *packaging* only. Thus, McNeil claims that it is entitled to summary judgment on Merisant's implied falsity claims with respect to all ads other than the Splenda package.

#### a. McNeil's Television and Print Advertising

McNeil argues because Merisant's surveys only address consumer perceptions of

Splenda packaging, and do not address any other aspect of McNeil's advertising or marketing campaign for Splenda, McNeil is entitled to summary judgment on Merisant's implied falsity claims with respect to all media other than the Splenda package. McNeil argues that it is "firmly established that a survey of how consumers perceive a particular advertisement (such as a product package) is not probative of how consumers may perceive other aspects of a company's advertising or marketing campaign." Def. Mem. Supp. 42.[4] However, McNeil does not cite a single case to supports this proposition as it relates to product packaging, which, conceivably, could appear in one form or another in all of its television or print advertising. Moreover, McNeil directs this Court to no case that addresses the issue of a common, "ubiquitous" logo or tagline that is pervasive throughout its entire advertising or marketing campaign.

By McNeil's own admission, Splenda's entire product identity is based upon, and McNeil has capitalized upon, Splenda's "unique sugar origins." McNeil Statement of Facts ¶ 47. On the first page of its Memorandum in Support of its Motion for Summary Judgment, McNeil argues that the "centerpiece" of its "high-profile," $235 million-plus advertising campaign for Splenda, are the claims that Splenda is "made from sugar" and "tastes like sugar." Def. Mem. Supp. Summ. J. 1. McNeil notes that a "made from sugar, tastes like sugar" tagline or logo has appeared on every

box of Splenda sold since September 2000, and a similar form of the tagline has appeared on every yellow Splenda packet sold and in every print advertisement that McNeil has published and in every television commercial it has aired. *See id.* 1–2; *see also* McNeil's Statement of Facts ¶ 49 (stating that all exterior product packaging for Splenda sold in the United States have borne the Splenda tagline that Splenda is "made from sugar, tastes like sugar"); *id.* ¶ 50 (stating that all Splenda individual serving packets sold in the United States have borne the Splenda tagline that Splenda is "made from sugar so it tastes like sugar"); *id.* ¶ 51 (stating that all television commercials have included a similar Splenda tagline); *id.* ¶ 52 (stating that all print advertising has included a similar Splenda tagline). If a jury were to find that "made from sugar" is impliedly false on a product package, the Court would be hard pressed to find the logic in permitting McNeil to utilize the exact same claim in other forms of media. Therefore, McNeil's motion for summary judgment on Merisant's implied falsity claims, as applied to all advertising and marketing materials other than Splenda packaging, will be denied.

#### b. Merisant's "Implied Falsity" Claim in General

McNeil argues that the statement "made from sugar" is true, unambiguous and not susceptible to the implication that Splenda "contains" sugar or is "natural."[5] McNeil

---

**4.** *See AstraZeneca LP v. Tap Pharm. Prods.,* 444 F.Supp.2d 278, 296 (D.Del.2006) (allowing a survey conducted with respect to a television advertisement as evidence that the television advertisement was misleading to consumers, but prohibiting use of the television survey to substantiate a claim that any of the other aspects of the advertising campaign were misleading to consumers); *Am. Home Prods. v. Procter & Gamble Co.,* 871 F.Supp. 739, 762 (D.N.J.1994) (rejecting the plaintiff's contention that surveys conducted with re-

spect to a free standing insert and television can be employed to assess whether other print advertising, namely, an advertisement in the New York Times, was false or misleading to the public).

**5.** McNeil contends that certain of Merisant's officers have conceded that "made from sugar" is literally true, in that Splenda is (on some molecular level) manufactured using sugar. Merisant disputes the literal truth of the phrase "made from sugar" and disputes

undertakes a two-pronged attack: first, McNeil argues that Merisant's surveys do not present a statistically high "confusion" rate that meets the Third Circuit Court of Appeals' threshold tests; second, McNeil argues that surveys should not be used to determine the meaning of words.

### i. *Merisant's surveys do not demonstrate confusion*

■ McNeil argues that the survey evidence that Merisant intends to present does not demonstrate confusion among consumers about the meaning of "made from sugar." Merisant's burden is to prove that McNeil's advertising has the tendency to deceive a substantial portion of the intended audience. *Novartis*, 290 F.3d at 590 (*citing Johnson & Johnson–Merck Consumer Pharm. Co. v. Rhone–Poulenc Rorer Pharm., Inc.*, 19 F.3d 125, 129 (3d Cir.1994)). Courts have acknowledged that a "confusion rate" of as low as 7.5% to 10% may be adequate while a confusion rate of 15% is almost always deemed sufficient. *Id.* at 594 (confusion rate of 15% was sufficient, acknowledging that the Second Circuit Court of Appeals had indicated that a 7.5% rate of confusion would suffice); *Sara Lee Corp. v. Kayser–Roth Corp.*, 81 F.3d 455, 466–67 & n. 15 (4th Cir.1996) (15 to 20% confusion was sufficient to establish "actual confusion . . . to a significant degree"); *Goya Foods, Inc. v. Condal Distribs., Inc.*, 732 F.Supp. 453, 457 n. 7 (S.D.N.Y.1990) (9 to 10% confusion rate was sufficient to demonstrate "meaningful evidence of actual confusion").

McNeil claims that the surveys conducted by Merisant's expert, Dr. Ostberg, revealed that only 9% of respondents said that Splenda's package conveyed that Splenda contains real sugar, and that only

4% thought that Splenda is a "natural" product. Def. Mem. Supp. 40. Merisant, on the other hand, claims that Dr. Ostberg's surveys reveal that 28% of respondents said that Splenda "contains real sugar" and 44% said that Splenda is a "natural" product. Pl. Mem. Opp'n 27. McNeil explains that the 9% and 4% responses were as a result of open-ended questions, and that the 28% and 44% responses resulted from different, "highly leading closed-ended" questions. Def. Mem. Supp. 40, 41 n. 30. McNeil argued that if this issue proceeds to trial, McNeil will prove that Dr. Ostberg's surveys were biased and suggestive. *Id.* at 41 n. 30.[6]

The parties' dispute on this point, however, demonstrates that this issue is ripe for trial. Because genuine issues of fact remain relating to the percentage of consumers (if any) that are "confused" by McNeil's advertising—which is the crux of a impliedly false advertising claim under the Lanham Act—summary judgment on this basis is inappropriate.

### ii. *Surveys should not be used to define words*

McNeil presents a second argument that Merisant's "implied falsity" claims should be dismissed, which is that surveys cannot be used in court to define words. McNeil argues that truthful and unambiguous statements are not susceptible to proof that they are misleading under the Lanham Act. Def. Mem. Supp. 47. Despite the law in the Third Circuit that even if a statement is "literally true," it may be prohibited if it "has the tendency to deceive consumers," McNeil argues, essentially, that Merisant cannot use survey evidence to define the word *"from"* in the phrase "made from sugar." *Novartis*, 290

that its officers have conceded the truthfulness of this statement.

**6.** At this juncture, McNeil has not sought to exclude Dr. Ostberg's surveys or any related testimony via a motion *in limine* or otherwise.

F.3d at 586; *Santana Prods.*, 401 F.3d at 136.

McNeil heavily relies on *Mead Johnson Co. v. Abbott Laboratories*, 201 F.3d 883 (7th Cir.2000) in support of its argument. In *Mead Johnson*, the Court of Appeals for the Seventh Circuit reversed the district court's holding that the phrase "1st Choice of Doctors" was misleading and violated the Lanham Act. The court of appeals criticized the district court's reliance on a survey that indicated that consumers understood the phrase "1st Choice of Doctors" to mean that a *majority* of doctors preferred the product when, in fact, only a *plurality* of doctors preferred the product. *Id.* at 884. The court identified a "deeper problem," namely, "the use of a survey in the first place" to define a word. *Id.* at 886. The court noted that consumer surveys are "accepted ways to probe for things such as confusion about the source of goods, for confusion depends on the effect of a phrase or trade dress on the consumer," but "never before has survey research been used to determine the meaning of words, or to set the standard to which objectively verifiable claims must be held." *Id.* at 885–86 (citations omitted). The court cautioned against "interpreting 'misleading' to include factual propositions that are susceptible to misunderstanding," but noted that a " 'misunderstood' statement is not the same as one designed to mislead." *Id.* at 886. In other words, semantics must be more than just semantics.

McNeil would have the Court follow *Mead Johnson* and hold that a survey cannot be used to determine the meaning of the word "from" in the phrase "made from sugar." McNeil claims that the phrase "made from sugar" is literally "true, unambiguous, and not reasonably susceptible to misinterpretation." Def. Mem. Supp. 52. Using the *Mead Johnson* rubric, McNeil's argument presents the question whether a survey used to determine consumers' confusion in perceiving the phrase "made from sugar" is akin to defining the word "first," as in "first choice of doctors," or closer to probing for confusion as to the "source of goods" by testing the "effect of a phrase or trade dress on the consumer." *Mead Johnson*, 201 F.3d at 886.

The phrase "made from sugar," may seem simple enough, and may eventually prove not to be misleading to consumers, but it has spawned a epic battle [7] among the parties over proper diction and syntax. For example, McNeil claims that "made from sugar" clearly excludes the interpretation that Splenda *is* sugar, or that Splenda is made *with* sugar. Made *with* sugar would mean that sugar is an ingredient listed on the package. Drawing upon an often effective rhetorical device, McNeil asks the question, how could a consumer interpret a product that is "made *from* sugar" and "tastes *like* sugar" as actually *being* sugar? Def. Mem. Supp. 52.

McNeil offers as an illustration the phrase "made in America." Def. Mem. Supp. 52. McNeil contends that a survey could not be introduced to prove that the

---

7. Chief Justice Marshall's opinion in *McCulloch v. Maryland*, 17 U.S. (4 Wheat) 316, 414, 4 L.Ed. 579 (1819), highlights the role of language in judicial disputes:

 Such is the character of human language, that no word conveys to the mind, in all situations, one single definite idea; and nothing is more common than to use words in a figurative sense. Almost all compositions contain words, which, taken in their rigorous sense, would convey a meaning different from that which is obviously intended. It is essential to just construction, that many words which import something excessive, should be understood in a more mitigated sense—in that sense which common usage justifies.
 *Id.*

phrase "Splenda is made in America"[8] is misleading because it is perceived by consumers as meaning that "Splenda is made in a facility staffed only by well-compensated union workers." *Id.* However, to tweak McNeil's illustration, say McNeil employed the claim that Splenda is "made in America," when, in fact, although the sugar cane used as the starting point in the process is grown in Louisiana, it is then shipped to a manufacturing plant in Mexico, where a "patented, multi-step process" is performed to produce the resulting no-calorie sweetener. Next, the no-calorie product it is shipped to Pennsylvania, where it is packaged in a bright yellow packages for sale as Splenda. What does "made in America" mean in this context? Does it mean that every step in the manufacturing process is performed in America? Or just one step? Therein, perhaps, lies the rhetorical rub.

However, while McNeil argues what the phrase "made from sugar" *cannot* reasonably be interpreted to mean, it does not present as strong an argument that the actual meaning of "made from sugar" is clear to consumers. In fact, as McNeil employs the phrase, "made from sugar" means that Splenda is made through a patented, multi-step process that starts with sugar and converts it, by replacing "three of eight hydroxyl groupings on the sucrose molecule with three chlorine atoms," into a no-calorie, non-carbohydrate sweetener. McNeil's Statement of Facts ¶ 5.

Even though "[a] court is permitted to find as a matter of law, without discovery to establish what consumers actually believed, that no reasonable consumer could

be misled by the challenged advertising," that is not the case here. *Haymond v. Lundy*, 2001 WL 15956, at *4, 2001 U.S. Dist. LEXIS 54, at *12 (E.D.Pa. Jan. 5, 2001). The decision whether to follow *Mead Johnson* may turn on whether "made from sugar" is merely "misunderstood" or whether it was deliberately designed to be misunderstood and, hence, to mislead. If the Court determines that Merisant has produced enough evidence showing that McNeil attempted to mislead consumers about Splenda's sugar origins, then *Mead Johnson* could not be followed. In addition, if the Court determines that survey evidence is being used to determine broader consumer confusion than just the meaning of the word "from", then again, *Mead Johnson* is inapposite.

The disputed facts as to McNeil's alleged intent to deceive consumers over the "sugar-origin" of Splenda are recited above. Those same disputes of fact preclude summary judgment on Merisant's implied falsity claims. Accordingly, McNeil's motion for summary judgment on Merisant's implied falsity claims will be denied.

### 3. *Disgorgement of McNeil's Profits*

■ McNeil's third and final argument in its Motion for Summary Judgment is that Merisant is not entitled to damages of disgorgement of profits of McNeil, also known as "accounting for profits." Section 35(a) of the Lanham Act provides that a plaintiff shall be entitled, "subject to the principles of equity, to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117(a).[9] The Court

---

**8.** Splenda is, in fact, made in America. Def. Mem. Supp. 52.

**9.** Section 35(a) provides further that:

The court shall assess such profits and damages or cause the same to be assessed under its direction. In assessing profits the plaintiff shall be required to prove defendant's sales only; defendant must prove all ele-

of Appeals for the Third Circuit, following the Fifth Circuit Court of Appeals' lead in *Quick Technologies v. Sage Group PLC,* 313 F.3d 338, 349 (5th Cir.2002), held that in evaluating whether equity supports disgorging the losing party's profits, a court should consider the following factors, including but not limited to:

> (1) whether the defendant had the intent to confuse or deceive, (2) whether sales have been diverted, (3) the adequacy of other remedies, (4) any unreasonable delay by the plaintiff in asserting his rights, (5) the public interest in making the misconduct unprofitable, and (6) whether it is a case of palming off.

*Banjo Buddies, Inc. v. Renosky,* 399 F.3d 168, 175 (3d Cir.2005) (*quoting Quick Techs.,* 313 F.3d at 349 (citations omitted)). A plaintiff may recover the defendant's profits if (1) the defendant has been unjustly enriched, (2) the plaintiff sustained damages or (3) disgorgement of profits is necessary to deter infringement. *Banjo Buddies,* 399 F.3d at 178. The Court of Appeals noted, in a trademark infringement case, that it was preferable for the plaintiff to receive a "windfall" instead of the defendant, because the infringing defendant "would be unjustly enriched and other would-be infringers would be insufficiently deterred." *Id.* Further, "there is no requirement that the defendant's profits approximate the plaintiff's damages." *Id.* at 177.

Merisant asserts that it will incur lost profits of $24 million as a result of McNeil's allegedly false advertising and

that McNeil will realize approximately $20.1 million in profits on sales allegedly diverted from Merisant by virtue of this conduct. Merisant also seeks to recover $176.1 million in profits that McNeil is alleged to have earned from all sources through 2006 as a result of its advertising. McNeil claims that an accounting of profits is neither equitable nor appropriate here because it would result in a windfall to Merisant, it raises the risk of multiple recovery against McNeil from other lawsuits that are currently pending or, in the event that Merisant prevails in the lawsuits, other similar lawsuits that may follow, and that, in the false advertising context, accounting of profits is only appropriate when the subject advertisement specifically targets the plaintiff.

Whether to award an accounting of profits to the plaintiff is a decision that lies within the Court's discretion. *See* 15 U.S.C. § 1117(a). However, a decision that disgorgement of profits would be proper or improper here would be decidedly premature at this juncture. Even a cursory glance at the factors enumerated in *Banjo Buddies* undermines the argument that the Court could or should now conclude that disgorgement would be inequitable here. Merisant has alleged that McNeil intended to deceive the public, and that through McNeil's alleged misconduct, Merisant's sales have been diverted. These allegations, if somehow proven, would mitigate in favor of disgorging McNeil's profits according to the *Banjo Buddies* calculus. *See Banjo Buddies,* 399

ments of cost or deduction claimed. In assessing damages the court may enter judgment, according to the circumstances of the case, for any sum above the amount found as actual damages, not exceeding three times such amount. If the court shall find that the amount of the recovery based on profits is either inadequate or excessive the court may in its discretion enter judg-

ment for such sum as the court shall find to be just, according to the circumstances of the case. Such sum in either of the above circumstances shall constitute compensation and not a penalty. The court in exceptional cases may award reasonable attorney fees to the prevailing party.

15 U.S.C. § 1117(a).

F.3d at 175. Of course, McNeil aggressively disputes these allegations, and none of these issues have been yet decided by a trier of fact. As such, these are highly contested disputes of material facts that preclude the Court from granting summary judgment on this issue. Therefore, McNeil's motion for summary judgment will be denied with respect to this claim.

### D. Merisant's Motion for Partial Summary Judgment on McNeil's Second Affirmative Defense of Unclean Hands

McNeil raises an affirmative defense of "unclean hands." By asserting an "unclean hands" defense, McNeil argues that Merisant should be precluded from seeking relief because of its own "unclean" conduct. McNeil argues that, before Splenda was launched, Merisant and its predecessors "embarked on a strategy to emphasize the assertedly 'natural components' of their artificial sweeteners in order to differentiate their products from those of their competitors." Def. Mem. Opp'n (Unclean Hands) 1. McNeil argues that Merisant adopted a "natural" marketing position and used the word "nature" or other concepts in order to position its products as *more* natural and *less* artificial. McNeil cites the following instances of Merisant's "unclean hands" conduct, with respect to Merisant's Equal, NutraSweet, Same and Candarel Nature products:

1. *Equal:* Merisant highlights the fact that aspartame, the sweetening ingredient in Equal, is "made by joining two amino acids naturally found in wholesome foods like milk, meats and grains," which are "foods we eat every day." D. Sandler Decl. Ex. 7.

2. *NutraSweet:* Merisant implies that NutraSweet is natural when it makes the comparative claim that "unlike saccharine, NutraSweet is the sweetener your body treats naturally." Def. Mem. Opp'n (Unclean Hands) 5.

3. *Same with Sugar:* Merisant acquired an aspartame-based artificial sweetener named "Same," which was available for sale in Puerto Rico. In 2003, a Merisant subsidiary introduced a product called "Same with Sugar" that used sugar as a bulking agent, even though, McNeil argues, sugar adds nothing to the product's taste. McNeil avers that Merisant launched "Same with Sugar" in a trade dress that was similar to Splenda, and included a logo that read "made with sugar." McNeil cites certain documents that indicate that Merisant intended to launch Same with Sugar to gain a more "natural" positioning.

4. *Candarel Nature:* In January 2005, a Merisant subsidiary launched an artificial sweetener named "Canderel Nature," which is sold exclusively in Mexico. McNeil objects to the word "Nature" in the products name. McNeil cites documents produced in this litigation that indicate that Merisant launched Candarel Nature in order to pursue a "natural" positioning for its artificial sweetener.

A district court has wide discretion in refusing to aid unclean parties, and the Court is not bound by any formula which would limit that discretion. *Haft v. Dart Group Corp.*, 841 F.Supp. 549, 577 (D.Del. 1993).[10] For a defendant to mount a suc-

10. The doctrine of unclean hands is applicable in actions seeking relief under the Lan-

ham Act. *Highmark, Inc. v. UPMC Health Plan*, 276 F.3d 160, 174 (3d Cir.2001) (*citing*

cessful unclean hands defense, the defendant must prove that the "plaintiff's conduct is inequitable and that it involves the subject matter of the plaintiff's claim." *Ciba–Geigy Corp. v. Bolar Pharm. Co.*, 747 F.2d 844, 855 (3d Cir.1984).

In the Third Circuit, a defendant asserting an "unclean hands" defense must introduce "clear, convincing evidence of 'egregious' misconduct." *Citizens Fin. Group, Inc. v. Citizens Nat'l Bank*, 383 F.3d 110, 129 (3d Cir.2004). "Egregious misconduct" can take the form of "fraud, unconscionability, or bad faith on the part of the plaintiff." *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 377 n. 7 (3d Cir.1992); *see also Sanofi–Aventis v. Advancis Pharm. Corp.*, 453 F.Supp.2d 834, 856–857 (D.Del.2006) (rejecting the "unclean hands" defense and holding that although defendant put forth some evidence that plaintiffs may have had a competitive purpose in filing the action, "clear, convincing and unequivocal evidence" of "egregious" conduct was lacking); *Highmark*, 276 F.3d at 174 ("The equitable doctrine of unclean hands applies when a party seeking relief has committed an unconscionable act immediately related to the equity the party seeks in respect to the litigation.").

Courts in this Circuit require the "nexus" between the plaintiff's alleged misconduct and the defendant's conduct that is the subject of the plaintiff's action to be "close." *Id.; Diamond Triumph Auto Glass, Inc. v. Safelite Glass Corp.*, 441

F.Supp.2d 695, 709 (M.D.Pa.2006) (*quoting Highmark*). Courts will apply the doctrine of unclean hands "'only for such violations of conscience as in some measure affect the equitable relations between the parties in respect of something brought before the court for adjudication.'" *Highmark*, 276 F.3d at 174 (*quoting Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245, 54 S.Ct. 146, 78 L.Ed. 293 (1933)); [11] *Pharmacia Corp. v. GlaxoSmithKline Consumer Healthcare, L.P.*, 292 F.Supp.2d 594, 610 (D.N.J.2003) ("[C]ourts do not apply the unclean hands doctrine just because plaintiffs have engaged in some inequitable conduct; rather, the inequitable conduct identified by the defendant must evince a very close nexus to the defendant's own misconduct that initially gave rise to the suit.").

Finally, to establish a defense of unclean hands, the defendant must allege that the defendant was injured "as a result of the misconduct." *Pharmacia Corp.*, 292 F.Supp.2d at 610 (citation omitted); *see also Santana Prods.*, 249 F.Supp.2d at 523 (requiring a defendant to show that the plaintiff's wrongdoing injured the defendant). The Third Circuit Court of Appeals has also held that injury to the public interest is a relevant consideration as well. *Citizens Financial*, 383 F.3d at 129 (noting that "the extent of actual harm caused by the conduct in question, either to the defendant or to the public interest, is a highly relevant consideration") (*quoting*

*Ames Publ'g Co. v. Walker–Davis Publ'ns, Inc.*, 372 F.Supp. 1, 13 (E.D.Pa.1974)).

11. In *Highmark*, the court declined to apply the doctrine when the plaintiff apparently engaged in the same conduct, two years earlier, in which the plaintiff accused the defendant of engaging. In July 1999, Highmark ran a print advertisement claiming to be the only health care plan offering "access" to five local hospitals ranked among America's best. In that action, UPMC claimed that Highmark,

having used the term "access" the same way UPMC did in the ad before the court, should be barred by unclean hands. Although the court did not explain why it chose not to apply the doctrine of unclean hands to bar plaintiff's claims, the court noted that "Highmark's inappropriate use of a term in its 1999 advertisement does not excuse current deceptive and misleading advertisements to the public." *Highmark*, 276 F.3d at 173–74.

*Republic Molding Corp. v. B.W. Photo Utilities,* 319 F.2d 347, 349–50 (9th Cir. 1963)).

Merisant argues that its past advertising highlighting certain "natural" aspects of its products was not "egregious," "unconscionable" or "inequitable." Merisant further argues that there is no nexus between McNeil's "made from sugar" advertising, and the general "natural" advertising approach that McNeil challenges. Finally, Merisant argues that there has been no injury—either to McNeil or to the "public interest"—that warrants imposing an "unclean hands" defense.

1. *Merisant's Conduct is Not "Egregious," "Unconscionable" or "Inequitable"*

■ McNeil advances a rather interesting argument in support of its "unclean hand" defense, in that it does *not* argue that Merisant's conduct is "egregious," "unconscionable" or "inequitable." Rather, to oppose Merisant's motion, McNeil presents the paradoxical argument that Merisant should be barred by its own "unclean hands" even though "neither the actions of Merisant nor those of McNeil in highlighting the origins of their products are wrongful." Def. Mem. Opp'n (Unclean Hands) 2. Indeed, McNeil specifically admits that Merisant has not engaged in inequitable conduct. *See id.* at 14 ("Consistent with Merisant's Position, McNeil Believes that Neither Merisant Nor McNeil Has Engaged in Inequitable Conduct.").

McNeil contends, however, that if Merisant is permitted to bring its claims, "McNeil must be allowed to present to the jury Merisant's own conduct, so that the jury may determine whether Merisant's claims should be barred ... because it has long engaged in essentially identical behavior to that which it challenges." *Id.*

However, the defense of "unclean hands" is not a mere "they did it too" defense, but instead serves as a shield against a plaintiff's claims when the plaintiff has engaged in "egregious misconduct." *See Citizens Financial,* 383 F.3d at 129. Thus, McNeil finds itself in the peculiar position of not wanting to argue that Merisant's past conduct is egregious, because that would seriously risk the implication that McNeil's own "factually indistinguishable" conduct rises to the same level.

McNeil describes a total of four alleged instances of Merisant's "unclean hands," all four of which involve, McNeil argues, an implied claim that Merisant's artificial products are "natural." According to McNeil, Merisant touts Equal's "natural" ingredients, and advertises the body's ability to treat NutraSweet "naturally." In addition, Merisant sells a product called "Same with Sugar" using the logo "made with sugar" on its packages, and a product called "Canderel Nature," sold exclusively in Mexico, which is an artificial sweetener that uses sugar as a bulking agent.

However, McNeil goes on to essentially concede that the first two examples of Merisant's "unclean hands"—its representations with respect to Equal and NutraSweet—are in fact true. McNeil admits that amino acids are found "naturally" in protein-containing foods, including meats, grains and dairy products. Merisant's Statement of Facts (Unclean Hands); McNeil's Response (Unclean Hands) ¶¶ 41–42. In addition, McNeil admits that the human body does metabolize aspartame, unlike saccharin and sucralose, into components that are also provided "naturally" by other foods. Merisant's Statement of Facts (Unclean Hands); McNeil's Response (Unclean Hands) ¶¶ 40, 43–46.

The parties dispute the propriety of addressing at all the advertising of Same with Sugar, a product sold by a Merisant

subsidiary in Puerto Rico, and Canderel Nature, a product sold by a Merisant subsidiary in Mexico. Merisant argues that only products that are sold in the United States are relevant to this case, such that products sold exclusively in Puerto Rico and Mexico, respectively, each of which is a consumer market that is distinct from the United States, cannot be used to support McNeil's "unclean hands" defense.

This geographical argument emanates from a discovery dispute between the parties that spans the past several years. During one of the parties' numerous discovery disputes in this case, McNeil objected to providing documents from McNeil affiliates operating outside the United States. *See* J. Landis Decl. Ex. 6. McNeil's contention, which was conveyed in a March 23, 2006 letter from McNeil's counsel to Merisant's counsel, was that "McNeil's advertising claims in foreign markets are not [sic] simply not relevant to this case, which, again, focuses solely on McNeil's advertising in the U.S. market." *Id.* at 1–2. The parties raised this issue at an April 11, 2006 status conference before the Court. The outcome of this dispute was that materials related to products sold in foreign countries are not relevant to this case and would not be discoverable, but that documents related to products sold in the United States are discoverable even if held by a foreign custodian. *See* J. Landis Decl. Ex. 7. At oral argument on these motions, counsel for McNeil contended that McNeil objected to searching files of foreign custodians for relevant documents, but that documents related to products sold in foreign countries that were produced by custodians in the United States were produced during discovery and are relevant. Jan. 30, 2007 Tr. 117:14–118:1. However, counsel for McNeil's March 23, 2006 letter states the more appropriate position in this case, which is that "McNeil's advertising claims in foreign markets are not [sic] simply not relevant to this case," such that information and documents pertaining to products sold outside the United States are similarly irrelevant. J. Landis Decl. Ex. 6. at 1–2.

Because documents and information related to products sold outside the United States are irrelevant to this law suit, any information related to Canderel Nature,[12] which is not sold in the United States, but is sold by a Merisant affiliate in Mexico, is not admissible. With respect to Puerto

---

12. The argument that Merisant presented as to why "Canderel Nature" should not be used to support McNeil's "unclean hands" defense is patently unworthy of consideration. Canderel Nature is sold exclusively in Mexico, and Spanish is Mexico's national language. Merisant argues that because "nature" is not a recognized word in the Spanish language, the use of the word "nature" in the product's name—when the product is actually artificial—is not inaccurate or misleading. *See* Pl. Mem. Supp. (Unclean Hands) 6 (arguing that the letters N–A–T–U–R–E "do not form any word in the Spanish language and they are thus not inaccurate when used in a brand name in a Spanish-speaking country."). The Spanish word for "nature" is "naturaleza." B. Lasky Decl. Ex. 17 at 496. However, the Spanish word for "natural" is "natural." *Id.*

The Court does not have any social science data to prove it, but the Court would expect that the average Spanish-speaking consumer would associate the English word "nature" with the Spanish equivalent.

By Merisant's logic on this point, it could sell an artificial sweetener in Mexico called "Sugar," which would not be misleading because "sugar" is not a recognized word in the Spanish language. Or, in the alternative, Merisant could market a wholly-artificial sweetener in the United States branded as "Azúcar," which is the Spanish word for "sugar," but which has no meaning in English. The argument also entirely overlooks the cultural development of a "shrinking" world that more than one "common" language is often used by the consumers within a single national border.

Rico,[13] McNeil argues that Merisant has attempted to position Same with Sugar as a "natural" product, by naming it "Same *with Sugar*," and by including on its packages a banner that reads "made with sugar" and images of sugar cane fields. McNeil quotes a Merisant representative as stating that with Same with Sugar, the company hoped to convey a "more natural positioning." McNeil's Response (Unclean Hands) ¶ 103. However, a distinguishing feature of Same with Sugar is that it is made with 97.5% real sugar. Merisant's Reply (Unclean Hands) ¶ 99; *see also* B. Lasky Decl. Ex. 11 ("A positioning statement that reflects a more natural image will be developed based on the fact that the formula is 97.5% sugar, but it costs less than other similar products."). Therefore, Same with Sugar's banner that reads "made with sugar" is literally true because Same with Sugar is, in fact, made *with* sugar, i.e., it *contains* sugar. *See* B. Lasky Decl. Ex. 11 ("New 'Same with Sugar' is not made from sugar, it is made WITH sugar, and it costs less than other products".). The package for Same with Sugar lists "sugar" as the first ingredient, along with "aspartame" and "acesulfame potassium." B. Lasky Decl. Ex. 8. The Court reiterates that McNeil does not argue that the labeling for Same with Sugar is false or misleading or that Merisant's conduct in

this regard is inequitable. *See* Def. Mem. Opp'n (Unclean Hands) 18 (stating that "neither Merisant nor McNeil acts 'inequitably' or 'egregiously' by truthfully informing consumers that their products are 'made from sugar' (in the case of Splenda) or 'made with sugar' (in the case of Same with Sugar or Canderel Nature))". The Court agrees. Naming a product, "Same with Sugar", which is actually composed of 97.5% real sugar, is not misleading.

### 2. *Nexus Between Merisant's Conduct and Its Claims*

McNeil states that it is "well established that a Lanham Act plaintiff may not on the one hand claim that a defendant has engaged in unfair competition, while at the same time engaging in conduct factually indistinguishable from that which it challenges." Def. Mem. Opp'n (Unclean Hands) 18. However, in support of this "well established" principle, McNeil goes on to cite cases where the defense of unclean hands applied because the plaintiff's conduct was *inequitable*. Furthermore, the cases McNeil cites describe conduct by the plaintiff that is nearly identical to the defendant's allegedly violative conduct, so that by definition, if the defendant were to be found liable for its inequitable conduct then plaintiff should not be able to recover

---

13. Merisant cites the parties' discovery dispute over products sold in *foreign* countries, and argues that Same with Sugar is not sold in the United States because Puerto Rico is not part of the United States. Merisant's Response (Unclean Hands) ¶ 99. This argument suggests that a remedial social studies class may be in order. Puerto Rico is a territory of the United States and as both parties in this litigation well know, because they have litigated against one another in the United States District Court for the District of Puerto Rico, the Lanham Act applies to products sold in Puerto Rico. *See McNeil–PPC, Inc. v. Merisant Co.*, 2004 WL 3316380, 2004 U.S. Dist. LEXIS 27733 (D.P.R. July 29, 2004) (an action for trade dress infringement and false advertising in violation of, *inter alia*, Sections 43(a)(1)(A) and 43(a)(1)(B) of the Lanham Act, 15 U.S.C. § 1125). Merisant represents that both parties view Puerto Rico as a "distinct and foreign consumer market from the United States" from a marketing perspective. However, corporate marketing strategy does not trump the United States of America's sovereignty. The parties in this case may have reached an agreement that only products sold in the market consisting of the continental United States are relevant to this action, but that is a separate issue from whether Puerto Rico is part of the United States.

because its conduct was similarly inequitable.[14]

It is clear that the entire artificial sweetener industry wants to shy away from the perception that its products are, in fact, artificial. In that regard, Merisant, McNeil and other companies highlight the "natural" components of their products, and the Court expects that the trial will surely include evidence in that regard. However, Merisant's claims are very specific: that "made from sugar" is, in fact, impliedly false because it gives consumers the impression that Splenda contains sugar or is either natural or more natural than competitors' products. There is a differ-

ence between highlighting the "natural" aspects of a product and actually attempting to imply (falsely) that a product is, in fact, natural or made from an ingredient found in nature.

Under Third Circuit precedent, the "nexus" between the defendant's conduct and the plaintiff's conduct must be close. Merisant's Complaint alleges five counts against McNeil. Specifically, Merisant argues that the claim that Splenda is "made from sugar" is literally and impliedly false, the claim "made from sugar so it tastes like sugar" is literally and impliedly false, Splenda's implied claim that it is natural is false and misleading, and Splenda's im-

---

14. In *Emco, Inc. v. Obst*, 2004 WL 1737355, 2004 U.S. Dist. LEXIS 12118 (C.D.Cal. May 7, 2004), the parties were competing sellers of industrial cutting tools. The plaintiff alleged that defendant violated the Lanham Act by representing that its blades were manufactured in the United States. In fact, neither the plaintiff's nor the defendant's blades were manufactured overseas. The defendant raised the defense of unclean hands, arguing that the plaintiff used the brand name "Americut" on foreign-made blades and employs classic American symbols such as the American flag and the Statute of Liberty in an effort to imply that its blades were manufactured in the United States. The court first concluded that the plaintiff failed to demonstrate several necessary elements of a Lanham Act violation, and that plaintiff's failure to adduce evidence defeated its motion for summary judgment. The court also found that the defendant proved the defense of unclean hands as a matter of law. The court determined that the plaintiff's "use of the Americut name and American symbols is a false statement of fact about the geographic origin" of its products. *Id.* at *5, 2004 U.S. Dist. LEXIS 12118 at *15. For that reason, the court found the plaintiff's conduct to be "inequitable." *Id.*

In addition, McNeil heavily relies upon *Haagen–Dazs, Inc. v. Frusen Gladje Ltd.*, 493 F.Supp. 73, 76 (S.D.N.Y.1980). In this case, in which Haagen–Dazs sought a preliminary injunction (and not summary judgment), Haagen–Dazs claimed that Frusen Gladje "intentionally packaged their product in a man-

ner calculated to trade upon [Haagen–Dazs's] unique Scandanavian marketing theme." *Id.* at 74. The court concluded that Haagen–Dazs had fallen "woefully short" of proving the standard for a preliminary injunction because no trademark was being infringed. *Id.* at 74–75. The court would not permit Haagen–Dazs's sole trademark—its name—to be broadened to include its "unique Scandanavian marketing theme." *Id.* The court stated:
[S]ince plaintiff has attempted to package its product in such a way as to give the impression that it is of Scandanavian origin, although it too is, in fact, of domestic origin, it is guilty of the same *deceptive* trade practices of which it accuses defendants. In short, since plaintiff's hands are similarly unclean, they may not secure equitable relief simply because defendants' hands may be a shade or two less clean.
*Id.* at 76 (emphasis added). Both *Emco* and *Haagen–Dazs* are distinguishable for the simple reason that, in each case, the court found that the plaintiff engaged in inequitable conduct, namely, it made deliberate, impliedly false statements about its products. McNeil cannot rely on these cases because McNeil has not claimed that Merisant has acted inequitably, or offered any false statements of fact on the part of Merisant. In fact, McNeil concedes that Merisant's advertising is factually true. Conversely, Merisant argues that McNeil has made impliedly false statements about its products in violation of the Lanham Act. This distinction is fatal to McNeil's "unclean hands" defense.

plied claim that it contains sugar is false and misleading. Merisant challenges specific advertising slogans and argues that Splenda is not actually made from sugar, and that to state otherwise is to imply that Splenda contains sugar or is somehow a "natural" product. However successful or unsuccessful Merisant's claims eventually will be, the Court finds that the examples McNeil has provided of Merisant's "unclean hands" conduct does not have a nexus that is close enough to McNeil's conduct to survive summary judgment.

### 3. *Injury to McNeil, to the Public Interest*

McNeil argues that Merisant's conduct has caused harm to McNeil and to the public. McNeil argues that the public has been injured because certain surveys indicate that consumers are deceived—or at least confused—by Merisant's positioning of its artificial sweeteners as "natural." Careful not to overstate the results of any survey evidence, McNeil argues that if a jury concludes that consumers are confused by Splenda advertising, then the jury may also draw a similar inference about Merisant's advertising. Secondly, McNeil alleges that it has been injured because any attempt by Merisant to confuse consumers comes at the expense of its competitors, including McNeil, the market leader. McNeil does not explain *how*[15] it has been injured, and does not provide any measure of damages.

McNeil's arguments are unavailing in this context of the unclean hands defense. McNeil's argument with respect any injury that Merisant's actions have allegedly caused are an ill-fated extension of its argument that "unclean hands" should bar Merisant's claims notwithstanding McNeil's own assertion that Merisant has not engaged in egregious or inequitable conduct. Because McNeil does not believe that Merisant has committed any inequitable conduct, McNeil's injury argument is couched in cautious language that stops short of describing any tangible injury to it or to the public interest. Because McNeil has failed to show with clear and convincing evidence that Merisant has engaged in "egregious" conduct, that Merisant's alleged misconduct and its own alleged misconduct share a "close" nexus, and that either it or the public interest have been injured by Merisant's alleged misconduct, Merisant's Motion for Partial Summary Judgment will be granted.

The Court notes that one of McNeil's main concerns is that if the jury is shown evidence of McNeil's alleged misconduct, then the jury should also be shown evidence of "Merisant's own essentially identical conduct." Def. Mem. Opp'n (Unclean Hands) 18. In this regard, however, in the last section of its motion papers on the issue of unclean hands, McNeil aptly and appropriately states that "evidence relating to Merisant's conduct will be presented to the jury for several purposes, regardless of McNeil's unclean hands defense." Def. Mem. Opp'n (Unclean Hands) 30.

Nothing in this Memorandum and Order precludes McNeil from seeking to admit at trial otherwise admissible evidence relating to Merisant's conduct or the conduct of other companies in the artificial sweetener

---

**15.** McNeil did argue that it has suffered a "more insidious" injury in that McNeil, as a relative newcomer to the artificial sweetener business, just followed the lead of the then-market leaders such as Merisant who "formulat[ed] industry practice in terms of the manner in which artificial sweeteners are market-ed." Def. Mem. Opp'n (Unclean Hands) 29. McNeil claims that if Merisant prevails, "then Merisant's unclean hands will have caused substantial and material prejudice to McNeil, as McNeil will have been held liable for simply following the lead set by Merisant and its cohorts." *Id.*

industry. As McNeil correctly notes, such evidence may prove to be admissible on the issues of damages, impeachment of witnesses, and marketing and advertising practices of the artificial sweetener industry.

## II. "*DAUBERT*" MOTIONS

McNeil has filed a Motion to Exclude the Testimony of Dr. James Fisher (Docket No. 106), and Merisant has filed a Motion to Exclude In Part the Testimony of Steven Munger (Docket No. 109). With respect to each motion, the moving party asserts that the relevant expert's testimony should be excluded because it does not comply with Rule 702 of the Federal Rules of Evidence and the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and its progeny.

### A. *Standard*

Federal Rule of Evidence 702, which governs the admissibility of expert testimony, provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed.R.Evid. 702.

The Supreme Court in *Daubert* imposed upon district courts the role of a gatekeeper, in order to "ensure that any and all scientific evidence is not only relevant, but reliable." *ID Sec. Sys. Canada, Inc. v.*

*Checkpoint Sys., Inc.*, 198 F.Supp.2d 598, 601–02 (E.D.Pa.2002) (quoting *Daubert*, 509 U.S. at 589, 113 S.Ct. 2786). When "faced with a proffer of expert scientific testimony ... the trial judge must determine at the outset, pursuant to Rule 104(a), whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand and determine a fact in issue." *Id.* at 602 (*quoting Daubert*, 509 U.S. at 592, 113 S.Ct. 2786). This gatekeeping function of the district court extends beyond scientific testimony to "testimony based on ... 'technical' and 'other specialized' knowledge." *Id.* (quoting *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999)).

Federal Rule of Evidence 702 provides "three distinct substantive restrictions on the admission of expert testimony: qualifications, reliability and fit." *Id.* (*quoting Elcock v. Kmart Corp.*, 233 F.3d 734, 741 (3d Cir.2000)). The party offering the expert testimony has the burden of establishing that the proffered testimony meets each of the three requirements by a preponderance of the evidence. *Id.* (*citing Padillas v. Stork–Gamco, Inc.*, 186 F.3d 412, 418 (3d Cir.1999)).

The first requirement, whether the witness is qualified as an expert, has been interpreted liberally to encompass "a broad range of knowledge, skills, and training." *Id.* (*quoting In re Paoli R.R. Yard PCB Litigation*, 35 F.3d 717, 741 (3d Cir.1994)).

The second prong requires the expert's testimony to be reliable. *Id.* When the expert testifies to "scientific knowledge," the expert's opinions "must be based on the 'methods and procedures of science' rather than on 'subjective belief or unsupported speculation'; the expert must have 'good grounds' for his or her belief." *Id.*

*(quoting In re Paoli,* 35 F.3d at 742). In considering whether there are "good grounds" for the expert's opinions, district courts should look at a series of factors: (1) whether a method consists of a testable hypothesis; (2) whether the method has been subject to peer review; (3) the known or potential rate of error; (4) the existence and maintenance of standards controlling the technique's operation; (5) whether the method is generally accepted; (6) the relationship of the technique to methods which have been established to be reliable; (7) the qualifications of the expert witness testifying based on the methodology; and (8) the non-judicial uses to which the method has been put.

*Id. (quoting In re Paoli,* 35 F.3d at 742 n. 8). This list of factors "is non-exclusive and ... each factor need not be applied in every case." *Id. (quoting Elcock,* 233 F.3d at 746). The Supreme Court has noted that the district court "must have considerable leeway in deciding in a particular case how to go about determining whether particular expert testimony is reliable. That is to say, a trial court should consider the specific factors identified in *Daubert* where they are reasonable measures of the reliability of expert testimony." *Id. (quoting Kumho Tire,* 526 U.S. at 152, 119 S.Ct. 1167).

■ The final prong requires that the expert testimony "fit" by assisting the tri-er of fact. *Id. (citing Oddi v. Ford Motor Co.,* 234 F.3d 136, 145 (3d Cir.2000)). "Admissibility thus depends in part upon 'the proffered connection between the scientific research or test result to be presented and particular disputed factual issues in the case.'" *Id. (quoting In re Paoli,* 35 F.3d at 743). The "fit" standard does not require plaintiff to prove "their case twice." *Id. (quoting Oddi,* 234 F.3d at 145). They need not "demonstrate to the judge by a preponderance of evidence that the assessments of their experts are correct, they only have to demonstrate by a preponderance of evidence that they are reliable." *Id. (quoting In re Paoli,* 35 F.3d at 744). Thus, the test does not require that the opinion have "the best foundation" or be "demonstrably correct," but only that the "particular opinion is based on valid reasoning and reliable methodology." *Id. (quoting Oddi,* 234 F.3d at 146).

### B. *McNeil's Motion to Exclude Expert Testimony of Dr. James Fisher*

■ Merisant offers Dr. Fisher as an expert witness in the field of marketing with specific expertise in brand positioning strategies. Dr. Fisher is a tenured professor of marketing with over 25 years of education and experience.[16] Dr. Fisher is expected to testify generally as to the standards and customs in the marketing industry and specifically as to the application of certain advertising and marketing

---

**16.** In his report, Dr. Fisher describes his academic focus on the areas of "consumer behavior, marketing management, and business ethics." Def. Mot. Exclude (Fisher) Ex. G. Dr. Fisher is currently a tenured Associate Professor of Marketing at Saint Louis University, a position he had held since 1991. *Id.* He was an Assistant Professor of Marketing from August 1985 to July 1991. *Id.* Since January 1994, Dr. Fisher has also served as Director of the Emerson Center for Business Ethics. *Id.* Dr. Fisher received a Ph.D. from the University of Illinois, Urbana, in 1988, in business administration with a concentration in marketing. *Id.* He also holds a Master of Divinity degree from Yale Divinity School, and an A.B. from the University of Illinois, Urbana. *Id.* He has published regularly in academic or peer-reviewed journals on issues such as marketing and business ethics, buyer behavior, marketing research and management, and consumer complaining behavior. *Id.* In addition, he serves as a consultant to numerous corporations, including Sony and Caterpillar, on brand positioning strategies and other issues. Pl. Opp'n Mem. (Fisher) 1.

techniques and strategies to McNeil's campaigns for Splenda.

Without challenging Dr. Fisher's credentials, qualifications or experience, McNeil argues that Dr. Fisher is an improper "expert" because he does not offer testimony concerning a matter "requiring scientific, technical, or specialized knowledge," as required by Rule 702 of the Federal Rules of Evidence and *Daubert.* McNeil argues that Dr. Fisher will testify, based solely on *McNeil's* internal documents, as to his subjective "opinions" regarding McNeil's positioning of Splenda as "sharing sugar's equities", and that such positioning was lucrative. McNeil argues that Dr. Fisher's opinions on brand positioning are matters on which that the jury is capable of undertaking on its own. *See* Def. Mot. Exclude (Fisher) 9 ("McNeil's chosen 'positioning' of Splenda, and the relative success of McNeil's advertising, are matters that the lay persons on the jury—themselves consumers—will easily be able to understand and decide."). Further, McNeil argues that calling Dr. Fisher is improper because all the information Merisant seeks to elicit—information pertaining to McNeil's brand positioning strategies for Splenda—is available through McNeil's fact witnesses. McNeil also argues that Dr. Fisher seeks to offer nothing more than an impermissible "narrative summary" of the facts at issue in this case, and, almost as an aside, that Dr. Fisher's opinions are not based on a "sound foundation" in violation of *Daubert.*

In response, Merisant argues that Dr. Fisher's testimony will not be duplicative of McNeil's fact witnesses, and that Dr. Fisher's testimony will be offered precisely in order to contradict McNeil's fact witnesses. Merisant argues that Dr. Fisher's testimony easily satisfies the first two *Daubert* factors, namely, that Dr. Fisher is qualified and that his testimony is reliable,

neither of which McNeil earnestly disputes. Lastly, Merisant argues that Dr. Fisher's testimony will aid the jury with respect to the specific issues in this case, and that for all of these reasons, Dr. Fisher's testimony is admissible. The Court agrees.

There is no doubt that certain of Dr. Fisher's opinions represent a fairly nuanced deviation from what McNeil argues are undisputed facts in this case. For example, Dr. Fisher states in his expert report that McNeil chose a marketing position referred to as "positioning with respect to a product class." Def. Mot. Exclude (Fisher) Ex. G at 2. In that regard, Dr. Fisher opines that McNeil created a marketing strategy to position Splenda in the "sugar" product class, and not in the "artificial sweetener" product class. *Id.* Dr. Fisher notes that McNeil marketed Splenda as "sugar without the calories." *Id.; see also* Def. Mot. Exclude (Fisher) Ex. A at 140:5–6. McNeil argues that this proposed testimony does not address a disputed fact in this case, as McNeil's own fact witnesses will testify as to this fact. *See* Def. Mot. Exclude (Fisher) 4 ("It is undisputed that McNeil has consistently positioned Splenda as providing many of the benefits of sugar, such as sugar-like taste and versatility in baking and cooking, without sugar's calories."); *id.* at 3 ("[L]ike all manufacturers of no-calories sweeteners, McNeil has sought to position its product as an alternative to sugar ...."). Merisant argues that McNeil's fact witnesses tend to tone down McNeil's intended message as something equivalent to advertising Splenda as an artificial sweetener that provides the benefits of sugar without sugar's negatives (i.e., calories). The difference between these positions seems to be a decision to market a product as "sugar without negative attribute X," where "X" represents a negative attribute of sugar, such as calories, or as "artificial sweetener

without negative attribute X," where "X" represents a negative aspect of other artificial sweeteners, such as poor taste, a health or safety concern, or unsuitability for baking. These nuanced positions indicate how intricately planned, and market-specific a marketing campaign can be.

By its own admission, McNeil has spent hundreds of millions of dollars to create a very specific brand positioning strategy, and to develop marketing and advertising strategies for Splenda. *See* McNeil's Statement of Facts ¶¶ 34–36. It developed product packaging, print, radio and television advertising, all of which involved choosing effective logos, taglines, jingles, evocative imagery, colors, product placement, celebrity spokespersons, including professional athletes and models, etc. McNeil commissioned numerous, ordinary course of business surveys to gauge consumers' perceptions of Splenda, including which product attributes consumers associate with Splenda versus with other products in the artificial sweetener industry. As Dr. Fisher opines in his report, McNeil faced several challenges in determining which brand position to choose. *See* Def. Mot. Exclude (Fisher) Ex. G at 6 (noting that, for example, concerns about negative health effects of other artificial sweeteners and results of blind tastes tests that failed to establish any taste preference for Splenda compared to certain competitors, would have challenged McNeil "to find a unique value proposition that will clearly set the brand apart from others"). In that regard, Dr. Fisher cites McNeil documents that adopt the position of marketing Splenda as "close to sugar," emphasizing its "closeness to sugar" as "key" to its product positioning. Def. Mot. Exclude (Fisher) Ex. G at 140:7–141:13. At one point, Dr. Fisher stated that McNeil positioned Splenda "in essence, as sugar without the calories" but then later stated that he was not offering an opinion that the "Splenda positioning was, in fact, sugar with the calories." *Compare id.* at 140:5–6 *with id.* at 141:10–13.

If McNeil disagrees with Dr. Fisher's opinions, if it finds that Dr. Fisher's testimony parrots that of its own fact witnesses, or if it detects inconsistencies in his testimony, skillful cross-examination will reveal such disagreements or inconsistencies, or, as may be preferred in some instances, consistencies. However, in an action that concerns allegedly false and misleading advertising, it is of dubious merit that McNeil would seek to exclude a marketing expert by arguing that his opinions on McNeil's brand positioning "has no bearing on *this case.*" Def. Reply (Fisher) 5. In light of the obvious importance that brand positioning strategies play in the marketing and advertising of a new entrant into an already highly competitive market, the Court declines to accept McNeil's argument that its brand positioning strategies, including its multi-million dollar advertising and marketing campaigns, would be so ordinary, obvious and self-evident to a layperson that Dr. Fisher's opinions would be so useless and redundant that they would not aid the jury in this case.

Further, McNeil offers very little case law in its motions papers in support of its argument that Dr. Fisher's opinions should be excluded other citing *Daubert* and its progeny for the general proposition that a court stands as the "gatekeeper" to ensure that an expert has "specialized" knowledge, and is not merely testifying as to a conclusion that the jury could arrive at on its own after reviewing the facts. McNeil does not cite a case where a court has excluded a "marketing" expert on the grounds that his "specialized knowledge" is so ordinary that it would be superfluous.

However, when an issue before the court pertains to the effect of a marketing an advertising campaign on a potential consumer, courts regularly permit expert testimony to aid the jury on the precise topic of marketing strategies. For example, in *Schwab v. Philip Morris USA, Inc.*, 2005 WL 2401647, at *4–5, 2005 U.S. Dist. LEXIS 21610, at *11–13 (E.D.N.Y. Sept. 29, 2005), one of the issues was the design and intent of the tobacco industry in promoting "light" or "low tar" cigarettes. *Id.* at *4–5, 2005 U.S. Dist. LEXIS 21610, at *12. The court denied the defendants' motion to preclude expert testimony from a marketing expert, whom the court noted was qualified. *Id.* at *4–5, 2005 U.S. Dist. LEXIS 21610, at *12–13. The court noted that in a fraud case, it is relevant "both what defendants knew and intended and how their activities were designed to influence the beliefs and activities of consumers. It can be assumed that the tobacco companies' advertising budgets and programs affected consumer reactions." *Id.* at *5, 2005 U.S. Dist. LEXIS 21610, at *13. Further, and of particular relevance to the present case, the court noted that "[a]dvertising methodologies are esoteric; the average juror could be helped by an explanation of how they work and were used by defendants."

As the Supreme Court has noted, "there are many different kinds of experts, and many different kinds of expertise." *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 150, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (citing an amicus brief which discussed expert testimony in cases involving experts in drug terms, handwriting analysis, criminal modus operandi, land valuation, agricultural practices, railroad procedures, attorney's fee valuation, and others). As McNeil notes elsewhere in its motion papers, "[t]he Third Circuit has repeatedly emphasized the liberal policy applied to admissibility of expert testimony." Def.

Opp'n (Munger) 9. *See Holbrook v. Lykes Bros. S.S. Co.*, 80 F.3d 777, 780 (3d Cir. 1996) ("The Federal Rules of Evidence embody a 'strong and undeniable preference for admitting any evidence having some potential for assisting the trier of fact.'" (quoting *DeLuca v. Merrell Dow Pharmaceuticals, Inc.*, 911 F.2d 941, 956 (3d Cir.1990))). This preference extends to the Third Circuit Court of Appeal's liberal interpretation of the specialized knowledge requirement. *See Waldorf v. Shuta*, 142 F.3d 601, 625 (3d Cir.1998) ("We have interpreted the specialized knowledge requirement liberally, and have stated that this policy of liberal admissibility of expert testimony 'extends to the substantive as well as the formal qualification of experts.'" (citations omitted)). Any inquiry as to the Court's "gatekeeping" role must be "'tied to the facts'" of a particular case. *Id. (citing Daubert*, 509 U.S. at 591, 113 S.Ct. 2786 (quoting *United States v. Downing*, 753 F.2d 1224, 1242 (3d Cir. 1985))). Because this is a case concerning allegations of false and misleading advertising, expert testimony regarding advertising, marketing and brand positioning adequately "fits" the issues at hand. Dr. Fisher's education, experience, analytical techniques and expert report comply with all elements of *Daubert* and Rule 702 of the Federal Rules of Evidence. In addition, the Court does not accept McNeil's argument that Dr. Fisher's testimony lacks a sound foundation because in support of its argument that Dr. Fisher's testimony should be excluded as unnecessarily redundant, McNeil argues that Dr. Fisher relies solely on McNeil's internal documents. If McNeil's internal documents do not provide a "sound foundation" for witness testimony, that issue can be addressed at trial. The Court finds that Dr. Fisher's testimony could be reliable and helpful to the jury, at least to the

extent of application of the *Daubert* tests. Accordingly, McNeil's motion to exclude Dr. Fisher's testimony will be denied.

C. *Merisant's Motion to Exclude In Part the Testimony of Steven Munger*

■ McNeil intends to call Dr. Steven Munger, "a highly respected researcher in sweeteners and how these compounds cause sweet taste," to testify as to the interaction between the specific chemical construction of sucralose and the human sweet taste receptor. Def. Opp'n (Munger) 2. The main issue Dr. Munger will address is McNeil's claim that Splenda is "made from sugar *so* it tastes like sugar." Specifically, Merisant objects to the word "so" in this phrase, which provides the causal connection between Splenda's chemical composition and its taste. In other words, McNeil claims that *because* Splenda is "made from sugar," Splenda "tastes like sugar," while Merisant argues that Splenda's sweet taste does not result from its sugar origins.

Merisant intends to call Dr. Eric Walters to testify that, in his view, the phrase "made from sugar *so* it tastes like sugar" is scientifically inaccurate and literally false. Dr. Walters will offer testimony based on his experience in sweetener chemistry and human taste studies.

McNeil intends for Dr. Munger to rebut Dr. Walters' testimony.

Merisant alleges that Dr. Munger lacks qualifications and specialized knowledge to provide rebuttal testimony. Specifically, Merisant argues that Dr. Munger has "no expertise or practical experience from which to provide knowledgeable and reliable opinions" on the issues of sweetener chemistry and human taste. Pl. Mem. Supp. (Munger) 1–2. Merisant acknowledges that Dr. Munger is an expert in "taste biology," but it claims that he lacks credentials in "sweetener chemistry." [17] Merisant seems to argue that since Dr. Munger is not an expert chemist, he can only testify as to how each substance— sugar and sucralose—tastes. He cannot testify *why* sucralose tastes like sugar, just that sucralose *does* taste like sugar. Therefore, Merisant's argument follows, Dr. Munger is unqualified to opine about the "so" in "made from sugar *so* it tastes like sugar." In other words, just because sucralose tastes like sugar does not mean that sucralose's taste can be directly attributed to sucralose's sugar origin. Merisant seeks to exclude parts D, E and F of Dr. Munger's Expert Report, which address the specific causal connection between the chemical composition of Splenda and its taste.[18]

**17.** Dr. Munger has a B.A. in biology from the University of Virginia, 1989, and a Ph.D. in neuroscience from the University of Florida, 1997. S. Zalesin Decl. Ex. 6B (Curriculum Vitae of Steven D. Munger, Ph.D.). From 2000 to 2006, Dr. Munger was an Assistant Professor of Anatomy and Neurobiology at the University of Maryland School of Medicine, and from 2006 to the present has been a tenured Associate Professor. *Id.* He frequently lectures on issues relating to the biology of taste and has authored or co-authored numerous articles, book reviews and academic abstracts. *Id.* He has completed at least two grant projects pertaining to taste receptors, in which he served as the principal investigator,

is involved one current grant project as principal investigator that pertains to how taste receptor structures influence the detection of sugars and sweeteners, and is involved in two grant projects as co-investigator that pertain to taste receptors, one of which specifically pertains to sweet receptor binding and activation. *Id.*

**18.** Section D is entitled, "Sucralose Retains the Sweet Taste Properties of Sucrose," section E is entitled, "Concentration–Response Relationships of Sucrose and Sucralose," and section F is entitled, "The Shallenberger AH–B Model." *See* S. Zalesin Decl. Ex 6 (Rebut-

McNeil argues that drawing a distinction between "taste biology" and "sweetener chemistry" is artificial. McNeil further argues that scientists in both fields look to the same question of how chemicals react with the human body to cause taste. On one level, it is surprising that McNeil, as a manufacturer of a *artificial* sweetener that is created in a laboratory through a patented, multi-step process, would downplay the importance of chemistry. The success of any product like Splenda depends on finding the right *chemical* combination to match sugar's attributes, especially with respect to taste. Merisant argues that the chemistry is of vital importance because, essentially, it is the precise chemical composition of sucralose that creates the sweet taste. Dr. Walters will testify that to make sucralose, McNeil adds a non-sweet chemical—galactosucrose—which it then chlorinates to generate sweetness. Therefore, Merisant argues, that *chemistry* creates the sweetness, not Splenda's sugar origins.[19]

Merisant cites no helpful case law in support of its motion. The Court is mindful that even though courts within in the Third Circuit apply Rule 702 liberally, these courts "have not pursued a policy of qualifying any proffered witness as an expert." *Waldorf,* 142 F.3d at 625; *see id.* at 625–26 (citing numerous cases where a court has determined that an expert was not qualified to testify). The Court has taken into consideration Dr. Munger's education and experience, and his research in taste biology. Dr. Munger may not be an expert is the "synthesis of sweeteners," but he is hardly a novice in the field of

chemistry or the specific field of food chemistry. Just recently in 2006, he was invited to speak at an American Chemical Society symposium on "Sweetness and Sweeteners" and "Food Chemistry." *See* S. Zalesin Decl. Ex. 6 at 2; S. Munger Decl. ¶¶ 3–4. Merisant does not challenge Dr. Munger's qualification in biology. The Court finds that Dr. Munger's qualifications and experience are sufficient, his methods are sound, and his expert report is based on an appropriate scientific foundation.

Aside from demonstrating that it is clear that McNeil and Merisant view this issue from different scientific disciplines, Merisant has not presented a convincing argument that Dr. Munger's testimony should be excluded. Merisant approaches this issue from the standpoint of sucralose's chemical composition while McNeil focuses on the biological reaction when sucralose or sugar interacts with the tongue. Presumably, these are intentional, strategic positions that each party has adopted. Each approach invites the opportunity for an expert to provide testimony either for or against it. On behalf of Merisant, Dr. Walters believes that in order to prove that sucralose retains the taste of sucrose, both compounds must bind to the same taste receptor in the same way. Dr. Munger opines that both sucrose and sucralose bind to both components of the sweet taste receptor and both sucrose and sucralose cause the same reaction to the taste receptor regardless of any difference in potency. The Court finds that Dr. Munger is qualified to render his opinion as set forth in

---

tal Expert Report of Steven D. Munger, Ph. D.).

**19.** According to McNeil, Merisant believes that it is "sheer coincidence that Splenda sucralose is both made from sugar and tastes like sugar." Def. Opp'n (Munger) 4. Yet, that

is not what Merisant argues. Rather, Merisant claims that Splenda sucralose can be synthesized from a number of chemicals, "[y]et regardless of what chemical Splenda sucralose is 'made from,' it will always taste the same." Pl. Mem. Supp. (Munger) 4.

his report, and Merisant's motion to exclude his testimony will be denied.

CONCLUSION

For the reasons stated above, McNeil's Motion for Summary Judgment will be denied, Merisant's Motion for Partial Summary Judgment will be granted, and each party's motion to exclude expert testimony will be denied. An appropriate order follows.

## ORDER

**AND NOW,** this 2nd day of March, 2007, upon consideration of the Motion for Summary Judgment filed by McNeil Nutritionals, LLC and McNeil–PPC, Inc. (collectively, "McNeil") (Docket No. 107), the response thereto filed by Merisant Company ("Merisant") (Docket No. 127), McNeil's Reply (Docket No. 137), the Motion for Partial Summary Judgment on McNeil's Second Affirmative Defense of Unclean Hands filed by Merisant (Docket No. 108), McNeil's response thereto (Docket No. 121), Merisant's Reply (Docket No. 142), McNeil's Motion to Exclude Testimony of Dr. James Fisher (Docket No. 106), Merisant's response thereto (Docket No. 128), McNeil's reply (Docket No 140), Merisant's Motion to Exclude in Part the Testimony of Steven Munger (Docket No. 109), McNeil's response thereto (Docket No. 118), and Merisant's Reply (Docket No. 147), it is hereby **ORDERED** that:

1. McNeil's Motion for Summary Judgment (Docket No. 107) is **DENIED;**

2. Merisant's Motion for Partial Summary Judgment on McNeil's Second Affirmative Defense of Unclean Hands filed by Merisant (Docket No. 108) is **GRANTED;**

3. McNeil's Motion to Exclude Testimony of Dr. James Fisher (Docket No. 106) is **DENIED;** and

4. Merisant's Motion to Exclude in Part the Testimony of Steven Munger (Docket No. 109) is **DENIED.**